[Cite as *Oldendick v. Crocker*, 2016-Ohio-5621.]

# Court of Appeals of Ohio

EIGHTH APPELLATE DISTRICT
COUNTY OF CUYAHOGA

---

JOURNAL ENTRY AND OPINION
**No. 103384**

---

# ELISABETH L. OLDENDICK

PLAINTIFF-APPELLANT

vs.

# WINSLOW CROCKER, ET AL.

DEFENDANTS-APPELLEES

---

**JUDGMENT:**
REVERSED; REMANDED

---

Civil Appeal from the
Cleveland Heights Municipal Court
Case No. CVF-1301348

**BEFORE:** E.A. Gallagher, P.J., Kilbane, J., and Stewart, J.

**RELEASED AND JOURNALIZED:** September 1, 2016

**ATTORNEY FOR APPELLANT**

Helen M. Kendrick
5658 McCarthy Court
West Chester, Ohio 45069


**ATTORNEYS FOR APPELLEES**

Lewis A. Zipkin
In Son J. Loving
Zipkin Whiting Co., L.P.A.
The Zipkin Whiting Building
3637 South Green Road
Beachwood, Ohio 44122

EILEEN A. GALLAGHER, P.J.:

**{¶1}** Appellant Elisabeth Oldendick appeals from a judgment of the Cleveland Heights Municipal Court in favor appellees Winslow Crocker and Anna Crocker (collectively, "appellees") on Oldendick's amended complaint and appellees' counterclaim. Oldendick contends that the trial court erred in permitting appellees to retain $1,720 that she had paid for the first month's rent and security deposit following her anticipatory breach of an apartment lease. She further contends that she was entitled to recover double the amount of her security deposit as damages under R.C. 5321.16(C). For the reasons that follow, we reverse the trial court's judgment and remand the matter for further proceedings.

**Factual Background and Procedural History**

**{¶2}** In September 2013, Oldendick and her then-boyfriend Forrest Ostrander (collectively, the "lessees") were looking for an apartment to rent in the Cleveland area. After seeing an advertisement on Craigslist, Oldendick and Ostrander met with Luibov Rudyvk, appellees' rental agent, who showed them various properties available for rent. One of the properties was an apartment located at 1642 Belmar Road, #2, in Cleveland Heights (the "Belmar apartment" or the "property"). Oldendick and Ostrander told Rudyvk that they were interested in renting the Belmar apartment and Rudyvk gave them rental applications to complete. On September 10, 2013, Oldendick and Forrester returned their rental applications and met with Rudyvk to sign a one-year lease for the

Belmar apartment commencing October 1, 2013 and ending September 30, 2014 (the "lease" or the "lease agreement").

**{¶3}** Anna Crocker owned the property and her son, Winslow Crocker ("Crocker"), was responsible for renting and managing the property. Crocker's company, Urban Restoration Project, was identified as the "lessor" in the lease and his contact information appeared at the top of the lease. At the time the lease agreement was signed, Urban Restoration Project was not registered with the Ohio Secretary of State. Crocker registered "Urban Restoration Project LLC" with the Ohio Secretary of State in March 2015.

**{¶4}** Under the lease, a monthly payment of $860 was due on the first day of the month and an $860 security deposit was also required. Although the lease indicates that $860 is the "monthly rent" for the Belmar apartment, the parties stipulated that "[t]he rent amount under the lease was $800/month, with an additional $60/month fee for [Oldendick's] dog."[1] Crocker testified that, when a tenant has a pet, he adds a pet fee to the monthly rent payment for "a number of reasons," including because "[t]hey may cause extra noise, or extra problems, and possibly damage." All payments due under the lease were to be made in cash or by check or money order payable to Crocker. Oldendick

---

[1]We note that the parties' stipulation is contrary to the lease's internally inconsistent pet clause. The lease's pet clause states:

> PETS. NO PETS ARE PERMITTED. IF THERE ARE PETS, LESSEE(S) AGREES TO PAY AN ADDITIONAL $10 PER MONTH PER CAT OR DOG UNDER 40 POUNDS AND $20 PER MONTH PER DOG OVER 40 POUNDS. ONE DOG PERMITTED, NO ADDITIONAL FEE.

testified that she understood that Crocker was the landlord for the apartment at the time she signed the lease.

{¶5} The lease included an "early termination" provision, which provides:

LESSEE(S) MUST NOTIFY LESSOR SIXTY (60) DAYS PRIOR TO EARLY TERMINATION OF THIS AGREEMENT. IF LESSOR SO CHOOSES TO AGREE TO AN EARLY TERMINATION OF THIS AGREEMENT, LESSEE(S) AGREES TO PAY A FEE OF ONE MONTH'S RENT IN ADDITION TO THE REGULAR RENT UNTIL A TENANT SUITABLE TO LESSOR EXECUTES A NEW LEASE TERM.

{¶6} Prior to signing the lease, Oldendick read through the entire document. She testified that she reviewed and understood each provision including the early termination provision. After she signed the lease, Oldendick gave Rudyvk a check payable to Crocker in the amount of $1,720 for the first month's payment and the security deposit. Rudyvk told Oldendick that she would give her the keys for the Belmar apartment and a signed copy of the lease by her move-in date, October 1, 2013. Rudyvk then returned the lease to Crocker who signed the lease in his own name as, and for, Urban Restoration Project and negotiated the check from Oldendick. Oldendick never received the keys to the Belmar apartment and did not receive a copy of the executed lease until sometime in early November 2013.

{¶7} On September 13, 2013, three days after Oldendick and Ostrander signed the lease, Oldendick called Rudyvk and told her that she and Ostrander had changed their minds, i.e., that they would not be moving to Cleveland Heights and, therefore, no longer

needed to rent the apartment. Rudyvk responded that she would speak with Crocker about the matter.[2]

{¶8} Oldendick called Rudyvk again the following day and asked if she had spoken with Crocker. Rudyvk replied that she had not yet contacted him but that she would do so the following Monday. A day or two later, Oldendick again called Rudyvk. She informed Rudyvk that she wanted Crocker to return her $1,720 and requested Crocker's telephone number. Rudyvk texted Crocker's telephone number to Oldendick and Oldendick forwarded the number to her mother, attorney Helen Kendrick. Neither Oldendick nor Ostrander ever took possession of the apartment.

{¶9} Attorney Kendrick thereafter called Crocker and demanded the return of the $1,720 Oldendick had paid when she and Ostrander signed the lease. Crocker said that he would talk with his attorney about the situation. On September 28, 2013, Attorney Kendrick emailed a letter to Crocker, confirming their conversation. In her letter, Attorney Kendrick indicated that Oldendick had "repudiated" the lease on September 13, 2013, and demanded the return of the $1,720 Oldendick had paid for the October 2013

---

[2]It is unclear from the record whether this conversation between Oldendick and Rudyvk occurred before or after Crocker signed the lease. There was no testimony indicating when Crocker signed the lease and the lease does not reflect the date on which he signed it. Similarly, there is no evidence in the record as to when Crocker negotiated the check he received from Oldendick. Oldendick, however, does not argue on appeal that the parties did not enter into a lease agreement before she notified Rudyvk that she no longer wanted the apartment. Furthermore, at trial, Oldendick's counsel expressly acknowledged that there was no issue as to the validity of the lease, asserting "[t]he question is not whether or not there's a lease, the question is whether certain provisions of the lease are enforceable." Accordingly, we do not address the validity of the lease.

rent and the security deposit for the Belmar apartment. Attorney Kendrick requested that the money be refunded via a cashier's check or money order payable to Oldendick and sent to Attorney Kendrick at her address.

{¶10} That same date, Oldendick entered into a thirteen-month lease for an apartment in Marsol Towers in Mayfield Heights (the "Marsol apartment"). The lease commenced on September 28, 2013, at a lower monthly rent than the Belmar apartment.[3]

{¶11} On or around September 20, 2013, Crocker began advertising on Craigslist that the Belmar apartment was again available for rent. Crocker claimed that although he had several other vacant apartments he could have rented to prospective tenants, he directed Rudyvk to show the Belmar apartment to prospective tenants first. After approximately eight showings of the Belmar apartment, Crocker leased the Belmar apartment to a new tenant. The new lease was executed on October 22, 2013, and commenced on November 1, 2013. The monthly rent was $810, $50 a month less than the monthly payment under Oldendick's lease, but $10 more than the monthly rent under Oldendick's lease because the new tenant did not have a dog. Crocker paid Rudyvk $120 for her time in showing the apartment to prospective new tenants and an additional $100 in commission for the newly executed lease.

---

[3]Oldendick claimed that she rented the Marsol apartment, even though she had previously entered into a lease for the Belmar apartment, because she could not afford the rent and utility payments for the Belmar apartment on her own. The original rent for the Marsol apartment was $717 a month but, due to a rental promotion, Oldendick received one month's rent for free. Prorated over the term of the lease, Oldendick's rent for the Marsol apartment, including heat, was $667 a month.

{¶12} On October 25, 2013, Attorney Kendrick sent a second letter to appellees, again demanding that appellees refund the $1,720 Oldendick paid to lease the Belmar apartment. On or about November 4, 2013, Crocker sent a response, indicating that he would not be returning the funds Oldendick had paid him because appellees had been unable to re-rent the Belmar apartment until November 1, 2013 and, according to the terms of the lease, Oldendick was responsible for the October rent and an early termination fee of one month's rent. Crocker enclosed copies of the lease Oldendick had signed and a copy of the lease with the new tenant.

{¶13} On November 18, 2013, Oldendick filed a complaint in the Cleveland Heights Municipal Court against Crocker and Anna Crocker, individually and d.b.a. Urban Restoration Project, seeking to recover (1) the $1,720 she paid for the first month's rent and security deposit under the lease, (2) "an equal amount as damages" and (3) attorney fees and costs.[4] Oldendick thereafter filed an amended complaint adding a claim for declaratory relief and seeking a declaration that the lease was void and unenforceable.

{¶14} On December 27, 2013, appellees filed their answer, raising a laundry list of affirmative defenses, and a counterclaim against Oldendick for "bad faith — breach of contract" based on her alleged misrepresentations to Crocker that she wanted to terminate the lease because she was moving to another state and no longer needed an apartment in Cleveland and her "unsupported claims of fraud and unjust enrichment" against appellees. Appellees sought to recover compensatory and punitive damages, attorney fees and

---

[4]In her complaint, Oldendick asserted five "causes of action": (1) failure to comply with R.C. 5321.16(B), (2) unjust enrichment, (3) failure to comply with R.C. 5321.18, (4) failure to mitigate damages and for refund of deposit and (5) a claim that the lease was void and unenforceable because it included unconscionable clauses in violation R.C. 5321.13 and 5321.15(B) and a liquidated damages provision "not related to any actual loss of income."

costs. Oldendick filed a reply to the counterclaim, asserting that appellees had failed to state a claim for which relief could be granted, that appellees lacked standing to assert a counterclaim for breach of the lease and that punitive damages were not recoverable on appellees' breach of contract claim.

{¶15} The case proceeded to a bench trial. On July 10, 2015, the trial court issued its decision, finding in favor of appellees on both Oldendick's amended complaint and appellees' counterclaim. The trial court determined that Oldendick and Ostrander had entered into a valid lease with Crocker on or about September 10, 2013, and that the parties were "at that point bound by the terms and conditions of the lease agreement." The trial court further found that Oldendick had breached the lease agreement by repudiating the lease and refusing to take possession of the leased premises and that Crocker had taken reasonable steps to re-rent the Belmar apartment and mitigate his damages. The trial court concluded that the early termination provision was valid and enforceable, that it was not an "unconscionable punitive penalty" and that, as a result of Oldendick's breach of the lease, appellees were "entitled to keep" the $1,720 Crocker received from Oldendick as the October 2013 rent and the early termination fee. No additional damages were awarded on appellees' counterclaim.

{¶16} Oldendick appealed, raising the following two assignments of error for review:

> First Assignment of Error:
> The trial court erred to the prejudice of appellant by disregarding the applicability and mandates of Ohio's landlord-tenant law, R.C. Chapter 5321.

Second Assignment of Error:
The trial court erred to the prejudice of appellant by finding for appellees on their counterclaim and awarding appellees damages, in the form of a set-off.

**Law and Analysis**

{¶17} Because they are interrelated, we address Oldendick's first and second assignments of error together. In her first assignment of error, Oldendick contends that the trial court erred in entering judgment in favor of appellees on her amended complaint because (1) the lease contains several unconscionable or otherwise unenforceable provisions; (2) appellees failed to comply with R.C. 5321.16(B) and provisions of the lease that required the timely return of Oldendick's security deposit; and (3) Oldendick was entitled to double the amount of her security deposit as damages under R.C. 5321.16(C). In her second assignment of error, Oldendick contends that the trial court erred in entering judgment in favor of appellees on their counterclaim and allowing them to set off their alleged damages against Oldendick's security deposit because appellees were not parties to the lease and Urban Restoration Project was not registered with the Ohio Secretary of State. She also contends that appellees failed to make reasonable efforts to mitigate their damages, entitling Oldendick to a refund of her prepaid October 2013 rent, and that the trial court "miscalculat[ed]" the damages appellees "were entitled to receive against [Oldendick's] security deposit."

**Unconscionability**

**{¶18}** Oldendick first contends that the trial court should have declared "the entire lease unenforceable" under R.C. 5321.14 because the lease included a provision authorizing the payment of the lessor's attorney fees and various "self-help provisions" that she claims are "unconscionable" and in violation of R.C. 5321.13(C) and other provisions of Ohio law.

**{¶19}** R.C. 5321.14(A) provides:

> If the court as a matter of law finds a rental agreement, or any clause thereof, to have been unconscionable at the time it was made, it may refuse to enforce the rental agreement or it may enforce the remainder of the rental agreement without the unconscionable clause, or it may so limit the application of any unconscionable clause as to avoid any unconscionable result.

**{¶20}** With respect to a provision that is alleged to be unconscionable, R.C. 5321.14(B) further provides:

> When it is claimed or appears to the court that the rental agreement, or any clause thereof, may be unconscionable, the parties shall be afforded a reasonable opportunity to present evidence as to its setting, purpose, and effect to aid the court in making the determination.

**{¶21}** Whether a particular contract or contract provision is unconscionable is a question of law subject to de novo review. *Taylor Bldg. Corp. of Am. v. Benfield*, 117 Ohio St.3d 352, 2008-Ohio-938, 884 N.E.2d 12, ¶ 34; *Devito v. Autos Direct Online, Inc.*, 2015-Ohio-3336, 37 N.E.3d 194, ¶ 16 (8th Dist.); *Martin v. Byke*, 8th Dist. Cuyahoga No. 88878, 2007-Ohio-6816, ¶ 25. The party claiming unconscionability bears the

burden of proving that the contract or provision at issue is unconscionable. *Taylor Bldg.* at ¶ 33.

{¶22} In *Martin*, this court explained the concept of unconscionability as follows:

"Unconscionability is generally recognized to include an absence of meaningful choice on the part of one of the parties to a contract, combined with contract terms that are unreasonably favorable to the other party." *Collins v. Click Camera & Video, Inc.* (1993), 86 Ohio App.3d 826, 834, 621 N.E.2d 1294. "Unconscionability thus embodies two separate concepts: 1) unfair and unreasonable contract terms, i.e., 'substantive unconscionability,' and 2) individualized circumstances surrounding each of the parties to a contract such that no voluntary meeting of the minds was possible, i.e., 'procedural unconscionability' * * *. These two concepts create what is, in essence, a two-prong test of unconscionability. One must allege and prove a 'quantum' of both prongs in order to establish that a particular contract is unconscionable." *Id.*, quoting White & Summers, *Uniform Commercial Code* (1988) 219, Section 4-7.

Substantive unconscionability concerns the actual terms of the agreement and whether the terms are unfair and unreasonable. *Collins*, *supra*, at 834. Contract clauses are unconscionable where the "clauses involved are so one-sided as to oppress or unfairly surprise [a] party." *Neubrander v. Dean Witter Reynolds, Inc.* (1992), 81 Ohio App.3d 308, 311-312, 610 N.E.2d 1089.

Procedural unconscionability involves the circumstances surrounding the execution of the contract between the two parties and occurs where no voluntary meeting of the minds was possible. *Collins*, *supra* at 834. In determining procedural unconscionability, a court should consider factors bearing on the relative bargaining position of the contracting parties — including age, education, intelligence, business acumen, and experience in similar transactions — whether the terms were explained to the weaker party, and who drafted the contract. *Id.*, citing *Johnson v. Mobil Oil Corp.*, 415 F.Supp 264, 268 (E.D.Mich. 1976).

*Martin,* 2007-Ohio-6816, at ¶ 28-30; *see also Devito v. Autos Direct Online, Inc.*, 2015-Ohio-3336, 37 N.E.3d 194, ¶ 14-20 (8th Dist.); *Good Knight Props., LLC v. Adam*, 6th Dist. Lucas No. L-13-1231, 2014-Ohio-4109, ¶ 19-21; *Kopp v. Associated Estates Realty Corp.*, 10th Dist. Franklin No. 09AP-719, 2010-Ohio-1690, ¶ 16.

**{¶23}** The trial court did not award appellees any attorney fees and there is no claim that appellees exercised any of the "self-help" remedies that Oldendick contends are objectionable. Accordingly, even assuming those provisions of the lease were invalid, we find no error by the trial court in refusing to declare the entire lease unenforceable under R.C. 5321.14(A) based on the inclusion of those provisions.

**{¶24}** Oldendick further contends that even if the lease was not unenforceable in its entirety, at the very least the trial court should have found the early termination provision to be unconscionable and refused to enforce it under R.C. 5321.14(A) and R.C. 5321.16(B).

### The Early Termination Provision and R.C. 5321.16(B)

**{¶25}** As an initial matter, we note that Oldendick misinterprets the early termination provision. In her brief, she asserts that the early termination provision requires a tenant who terminates a lease early to pay "double the agreed-upon rent, up to and until the premises is rented to another tenant." That is not correct. Under a plain reading of the early termination provision, a tenant who wishes to terminate the lease before the lease's termination date must pay "a fee of one month's rent in addition to the regular rent until a tenant suitable to lessor executes a new lease term," i.e., a single $860 early termination fee plus the "regular rent" until the landlord secures a new tenant. Oldendick testified that this was her understanding of the provision.

**{¶26}** Oldendick argues that the early termination provision is unconscionable because the early termination fee (1) is a penalty, "designed to punish the tenant without

any relationship to any actual damages suffered by the lessor" and (2) is inconsistent with R.C. 5321.16(B) and, therefore, was not a "permissible deduction" from Oldendick's security deposit.

{¶27} Appellees respond that the early termination provision is not a penalty, but rather, "just another term of the lease." Appellees maintain that they were entitled to "enforc[e] the contract damages upon the lease's term" by deducting the early termination fee from Oldendick's security deposit as "damages that the landlord has suffered by reason of the tenant's noncompliance with * * * the rental agreement" under R.C. 5321.16(B). They further assert that even if the early termination provision was found to be a liquidated damages clause, it was enforceable because appellees' actual damages "may be difficult to prove" and the amount of the stipulated damages was reasonable and proportional to the actual damages sustained by appellees as a result of Oldendick's breach of the lease.

{¶28} "A landlord and a tenant may include in a rental agreement any terms and conditions, including any term relating to rent, the duration of an agreement, and any other provisions governing the rights and obligations of the parties that are not inconsistent with or prohibited by Chapter 5321. of the Revised Code or any other rule of law." R.C. 5321.06. R.C. 5321.16 sets forth the procedures, rights and obligations of landlords and tenants with respect to security deposits. R.C. 5321.16(B) provides:

> Upon termination of the rental agreement any property or money held by the landlord as a security deposit may be applied to the payment of past due rent and to the payment of the amount of damages that the landlord has suffered by reason of the tenant's noncompliance with section 5321.05 of

the Revised Code or the rental agreement. Any deduction from the security deposit shall be itemized and identified by the landlord in a written notice delivered to the tenant together with the amount due, within thirty days after termination of the rental agreement and delivery of possession. The tenant shall provide the landlord in writing with a forwarding address or new address to which the written notice and amount due from the landlord may be sent. If the tenant fails to provide the landlord with the forwarding or new address as required, the tenant shall not be entitled to damages or attorneys fees under division (C) of this section.

R.C. 5321.16(C) further provides:

If the landlord fails to comply with division (B) of this section, the tenant may recover the property and money due him, together with damages in an amount equal to the amount wrongfully withheld, and reasonable attorneys fees.

{¶29} Thus, R.C. 5321.16(B) requires that a residential landlord submit a written itemization and identification of any deductions from the security deposit along with the balance of the security deposit to the tenant within 30 days after termination of the lease and delivery of possession. If the tenant fails to provide a new or forwarding address, the tenant is not precluded from recovering his or her security deposit but is precluded from seeking damages and attorney fees under R.C. 5321.16(C).[5]

{¶30} It is the landlord's burden to establish the lawfulness of any deductions from the security deposit. *Zeallear v. F & W Props.*, 10th Dist. Franklin No. 99AP-1215,

---

[5]Oldendick also claims that appellees failed to comply with provisions of the lease that required the timely return of Oldendick's security deposit. However, she has not cited any authority that a violation of any such lease provision would entitle her to the statutory double damages she seeks under R.C. 5321.16(C). Accordingly, we do not separately address that argument here.

2000 Ohio App. LEXIS 3321, *10 (July 25, 2000), citing *Albreqt v. Chen*, 17 Ohio App.3d 79, 80, 477 N.E.2d 1150 (6th Dist.1983); *Paxton v. McGranahan,* 8th Dist. Cuyahoga No. 49645, 1985 Ohio App. LEXIS 9094 (Oct. 31, 1985). R.C. 5321.16(C) grants courts no discretion in the award of double damages. If a court determines that a landlord has wrongfully withheld a portion of a tenant's security deposit, the court must award double damages to the tenant. *Calhoun v. Yeager*, 4th Dist. Gallia No. 91 CA 12, 1992 Ohio App. LEXIS 1312, *6-7 (Mar. 26, 1992). Likewise, there is no requirement that a landlord act in bad faith before a tenant can recover double damages. *Smith v. Padgett*, 32 Ohio St.3d 344, 349, 513 N.E.2d 737 (1987). The parties agree that R.C. 5321.16 controls the result in this case. The trial court did not address R.C. 5321.16 in its decision.

{¶31} With respect to how courts should interpret R.C. 5321.16, the Ohio Supreme Court has stated:

> The Landlord-Tenant Act must be interpreted in such a manner that fair and equitable treatment will be afforded to both landlords and tenants. In many instances, the statute may be reasonably construed as having been enacted with the recognition of some degree of imbalance in the stance of the tenant in his dealings with the landlord; however, we must not construe any portion of the Act so as to render an inequity on the landlords of this state.
>
> As seen by this court, the intent of the General Assembly in enacting R.C. 5321.16(B) and (C) was three-fold. One, to specifically permit the landlord, upon termination of the rental agreement, to deduct from the rental deposit any unpaid rents and actual damages to the premises occasioned by the tenant. Two, to require prompt refunds of all or part of the security deposit or, in the alternative, to provide an explanation to the

tenant why all or any part of the deposit was not returned to him. And, three, to provide a penalty by way of damages and reasonable attorney fees against a noncomplying landlord for the wrongful withholding of any or all of the security deposit.

*Vardeman v. Llewellyn*, 17 Ohio St.3d 24, 28, 476 N.E.2d 1038 (1985).

**{¶32}** In this case, the record reflects that although Oldendick did not provide a forwarding address at the time she informed Rudyvk that she wanted to cancel the lease for the Belmar apartment, her counsel did so when she directed, in her September 28, 2013 letter to Crocker, that the security deposit be sent to Oldendick in care of her attorney. Crocker made one deduction from Oldendick's security deposit, i.e., the $860 early termination fee, which Oldendick had not paid following the early termination of the lease. Crocker notified Oldendick of this deduction in his November 4, 2013 letter to Oldendick's counsel. Because the amounts of the unpaid early termination fee and the security deposit were equal, once Crocker deducted the early termination fee from the security deposit, there was nothing left to return to Oldendick.

**{¶33}** The early termination fee was clearly intended as liquidated damages in the event of a breach involving early termination by the tenant. Crocker explained that he includes an early termination provision in his leases because "often times thing come up * * * life changes, but at the same time we want to [protect] oursel[ves] from unnecessary losses. * * * So we give people an opportunity to let us know what's going on and we try to accommodate as long as we can cover [our] costs and move on with our business." He indicated that in agreeing to an early termination "to help out" a tenant, "it costs us money" both in terms of the expenses in showing and re-renting the apartment earlier

than expected but also in terms of the loss sustained by placing a new tenant in a property that already has a lease rather than renting the new tenant another vacant apartment. He indicated that he knows "[m]aybe a hundred or more landlords" and that "everyone" he knows "has a very similar clause." With respect to how he decided upon one month's rent as the fee for early termination, Crocker stated only that "[i]t's industry standard, and there's a lot of things that factor into that."

{¶34} In *Boone Coleman Constr., Inc. v. Piketon*, Slip Opinion No. 2016-Ohio-628, the Ohio Supreme Court explained the function and effect of liquidated damages clauses as follows:

> [L]iquidated damages are damages that the parties to a contract agree upon, or stipulate to, as the actual damages that will result from a future breach of the contract. *Sheffield-King Milling Co. v. Domestic Science Baking Co.*, 95 Ohio St. 180, 183, 115 N.E. 1014 (1917).
>
> "'The effect of a clause for stipulated damages in a contract is to substitute the amount agreed upon as liquidated damages for the actual damages resulting from breach of the contract, and thereby prevents [sic] a controversy between the parties as to the amount of damages.'" *Dave Gustafson & Co., Inc. v. South Dakota*, 83 S.D. 160, 164, 156 N.W.2d 185 (1968), quoting 22 *American Jurisprudence 2d, Damages*, Section 235, at 321 (1965). "'If a provision is construed to be one for liquidated damages, the sum stipulated forms, in general, the measure of damages in case of a breach, and the recovery must be for that amount. No larger or smaller sum can be awarded even though the actual loss may be greater or less.'" *Id.*, quoting Section 235 at 321. Put another way, "a liquidated damages clause in a contract is an advance settlement of the anticipated actual damages arising from a future breach." *Carrothers Constr. Co., L.L.C. v. S. Hutchinson*, 288 Kan. 743, 754, 207 P.3d 231 (2009). * * * "The difficult problem, in each case, is to determine whether or not the stipulated sum is an unenforceable penalty or an enforceable provision for liquidated damages." *Dave Gustafson & Co.*, 83 S.D. at 165, 156 N.W.2d 185.

*Boone* at ¶ 11-12, 16.

**Liquidated Damages Provisions and R.C. 5321.16(B)**

{¶35} There is nothing in R.C. Chapter 5321 that expressly prohibits a liquidated damages provision in a residential lease. However, as Oldendick points out, several courts have interpreted R.C. 5321.06 and 5321.16(B) as prohibiting liquidated damages provisions in residential leases, reasoning that to permit a residential landlord to retain a security deposit on the basis of a liquidated damages provision without itemizing the landlord's actual damages would be "inconsistent" with R.C. 5321.16(B). In *Riding Club Apartments v. Sargent*, 2 Ohio App.3d 146, 440 N.E.2d 1368 (10th Dist.1981), the parties entered into a one-year lease that required a $150 security deposit. The lease provided that in the event the tenant vacated the premises prior to the lease's expiration, "a charge of $150 will be deducted from [the] security deposit" as "an amount necessary or incidental" to prepare the premises and secure a new tenant. *Id.* at 146. The Tenth District held that the provision was unenforceable, reasoning as follows:

> A liquidated damages clause permitting the landlord to retain a security deposit without itemization of actual damages caused by reason of the tenant's noncompliance with R.C. 5321.05 or the rental agreement is inconsistent with R.C. 5321.16(B), which requires itemization of damages after breach by the tenant of the rental agreement. Since the provision is inconsistent with R.C. 5231.16(B), it may not be included in a rental agreement and is not enforceable. R.C. 5321.06. It is immaterial that the liquidated damages clause might otherwise be enforceable as such rather than being found to be a penalty.

*Riding Club* at 147.

{¶36} In *Albreqt v. Chen*, 17 Ohio App.3d 79, 477 N.E.2d 1150 (6th Dist.1983), the parties entered into a lease that included a provision authorizing the landlord to deduct a $60 charge from the security deposit for cleaning the carpet after the tenant vacated the

premises. *Id.* at 80. Following *Riding Club*, the Sixth District held that the provision was inconsistent with R.C. 5321.16(B) and thus unenforceable. As the court explained:

> In this case, the trial court affirmatively found that when appellee vacated the apartment, the carpet was just as clean as or cleaner than when appellee initially moved into the apartment. Therefore, under the circumstances, appellee is not responsible for the cost of any carpet cleaning. In the absence of an affirmative showing, by way of itemization (*see* R.C. 5321.16[B]), that there was a specific need to clean the carpet, appellant's unilateral deduction was improper.

*Id.* at 80-81; *see also Ritter v. Fairway Park Props., L.L.C.*, 9th Dist. Summit No. 21509, 2004-Ohio-2518, ¶ 12 (liquidated damages clause stating predetermined money damages independent of any actual damage to the rental unit "is violative of R.C. 5321.16(B) which requires a list of actual damages"); *Sokol v. Sine*, 11th Dist. Trumbull No. 98-T-0155, 1999 Ohio App. LEXIS 4660, *4 (Sept. 30, 1999) (liquidated damages prohibited in a residential rental agreement); *Cook v. Heritage Glen Apts.*, 12th Dist. Butler No. CA96-03-055, 1996 Ohio App. LEXIS 4121, *1 (Sept. 23, 1996) (liquidated damages clause in lease is unenforceable). The *Chen* court stated, however, that R.C. 5321.16(B) does not preclude a lessor from taking "lawful deductions" from a tenant's security deposit, such as past due rent, damages suffered by the landlord by reason of the tenant's noncompliance with R.C. 5321.05 or damages suffered by reason of the tenant's noncompliance with the rental agreement. *Chen* at 81.

{¶37} In other cases, courts have performed a penalty analysis in determining whether a fixed fee or charge set forth in a lease could be lawfully deducted from the

security deposit. *See, e.g., Berlinger v. Suburban Apartment Mgt. Co.*, 7 Ohio App.3d 122, 124-125, 454 N.E.2d 1367 (8th Dist.1982) (provision in residential lease imposing $50 charge every time a motorcycle was brought on the premises in violation of lease's prohibition of motorcycles was not an enforceable liquidated damages provision where landlord failed to present evidence demonstrating that stipulated damages bore a reasonable relationship to actual damages sustained as a result of the breach; therefore, landlord could not properly deduct charges from security deposit and tenant was entitled to two times amount of security deposit wrongfully withheld under R.C. 5321.16(B)); *KGM Capital, LLC v. Jackson*, 1st Dist. Hamilton No. C-130438, 2014-Ohio-2427, ¶ 25-32 (where lessor sought, and trial court awarded lessor, past due rent as actual damages for tenant's breach of lease, lease provision stating that tenant automatically forfeits the security deposit and one month's rent upon breach of lease operated as a penalty for tenant's early termination of the lease and was not enforceable under R.C. Chapter 5321).

**{¶38}** Appellees argue that the early termination fee was enforceable because (1) courts have "upheld liquidated damages clauses" where actual damages "may be difficult to prove," the amount of damages is reasonable and proportional to the contract as a whole and the parties' intent to stipulate is clear and unambiguous, (2) Oldendick and Crocker were parties of "equal bargaining power" who "agreed to and freely negotiated" the early termination provision and (3) Crocker "suffered real, actual damages" as a result of Oldendick's breach of lease.

**{¶39}** However, the issue here is not whether liquidated damages provisions in residential leases are enforceable. The issue here is what a landlord is statutorily permitted to do, under the Landlord-Tenant Act, with a tenant's security deposit. If deductions from a security deposit are at issue, the provisions of the Landlord-Tenant Act apply, which limits permissible deductions from a security deposit to "*damages* that the landlord *has suffered* by reason of the tenant's noncompliance with section 5321.05 of the Revised Code or the rental agreement," i.e., actual damages sustained by the landlord as a tenant's failure to comply with R.C. 5321.05 or the lease. (Emphasis added.) R.C. 5321.16(B). *See, e.g., Vardeman*, 17 Ohio St.3d at 28, 476 N.E.2d 1038 (intent of the General Assembly in enacting R.C. 5321.16(B) and (C) was to permit the landlord, upon termination of the rental agreement, to deduct from the rental deposit "any unpaid rents and actual damages to the premises occasioned by the tenant"); *Ankney v. Dame*, 6th Dist. Lucas No. L-76-307, 1977 Ohio App. LEXIS 10154, *5-8 (Apr. 29, 1977) ("It is not so much a matter of saying that liquidated damages are prohibited in leases, but the issue is whether the deposit put up herein is covered by the Act. * * * Any actual damages are permitted to be obtained by the landlord from the security deposit. * * * [T]he parties may contract for liquidated damages. However, if a deposit is required, then the provisions of the Landlord-Tenant Act must be followed."); *see also Riding Club*, 2 Ohio App.3d at 147, 440 N.E.2d 1368; *Chen*, 17 Ohio App.3d at 80-81, 477 N.E.2d 1150; *Ritter*, 2004-Ohio-2518 at ¶ 12.

**Liquidated Damages or Penalty**

**{¶40}** Even if we were required to perform a liquidated damages-penalty analysis to determine the appropriateness of Crocker's deductions from Oldendick's security deposit, we would find that the early termination fee operated as a penalty.

**{¶41}** In determining whether a stipulated damages provision is an enforceable liquidated damages provision or an unenforceable penalty, the following test is applied:

> "Where the parties have agreed on the amount of damages, ascertained by estimation and adjustment, and have expressed this agreement in clear and unambiguous terms, the amount so fixed should be treated as liquidated damages and not as a penalty, if the damages would be (1) uncertain as to amount and difficult of proof, and if (2) the contract as a whole is not so manifestly unconscionable, unreasonable, and disproportionate in amount as to justify the conclusion that it does not express the true intention of the parties, and if (3) the contract is consistent with the conclusion that it was the intention of the parties that damages in the amount stated should follow the breach thereof."

*Boone,* Slip Opinion No. 2016-Ohio-628, at ¶ 18, quoting *Samson Sales, Inc. v. Honeywell, Inc.*, 12 Ohio St.3d 27, 465 N.E.2d 392 (1984), syllabus. Whether a contract clause providing for stipulated damages is an enforceable liquidated damages provision or an unenforceable penalty is a question of law subject to de novo review. *Boone* at ¶ 10, citing *Lake Ridge Academy v. Carney*, 66 Ohio St.3d 376, 380, 613 N.E.2d 183 (1993).

**{¶42}** "Whether a particular sum specified in a contract is intended as a penalty or as liquidated damages depends upon the operative facts and circumstances surrounding each particular case." *Kurtz v. W. Prop., L.L.C.*, 10th Dist. Franklin No. 10AP-1099, 2011-Ohio-6726, ¶ 27, quoting *Samson Sales*, 12 Ohio St.3d at 28-29, 465 N.E.2d 392. The trial court concluded, based on the proportionality of the early termination fee to the actual losses it found appellees sustained after Crocker's mitigation efforts — $770 versus $860 — that the early termination fee was "not an unconscionable penalty but rather a reasonable method of recovering unanticipated business expenses resulting from Plaintiff's breach of the lease agreement." The trial court did not, however, address the other elements of the liquidated damages test in its decision.

**{¶43}** Although the record reflects that Oldendick read and understood the early termination provision, there is nothing in the record that establishes that the parties were of "equal bargaining power" or that the early termination provision was "freely negotiated." Crocker's agent handed Oldendick a form lease prepared by Crocker that she read and signed.

**{¶44}** The early termination fee was one month's rent or $860, 1/12 of the value of the lease. Under the early termination provision, the landlord was entitled to recover that fee in addition to "the regular rent until a tenant suitable to lessor executes a new lease term."

**{¶45}** An enforceable liquidated damages clause "'contemplates the nonbreaching party's inability to identify and mitigate its damages.'" *Beatley v. Schwartz*, 10th Dist.

Franklin No. 03AP-911, 2004-Ohio-2945, ¶ 26, quoting *Lake Ridge Academy v. Carney*, 66 Ohio St.3d 376, 385, 613 N.E.2d 183 (1993). However, as a general rule, damages resulting from a breach of a residential lease are not difficult to ascertain and quantify. *See, e.g., Beatley* at ¶ 26 ("damages resulting from the breach of a residential lease are not difficult to prove or uncertain as to amount"); *Ankney*, 1977 Ohio App. LEXIS 10154, *8 ("The fact situation surrounding Landlord-Tenant is not such that damages are impossible or that difficult to ascertain. In those types of situations, liquidated damages are used as a penalty for breach.").

**{¶46}** In this case, Crocker had little difficulty identifying the actual damages he allegedly sustained as a result of Oldendick's breach of lease. He lost no monthly rent payments because Oldendick paid the October 2013 rent when she signed the lease. The monthly rent payment under the new lease, which commenced on November 1, 2013, was $810, $50 a month less than the monthly payment under Oldendick's lease because the new tenant did not have a dog — resulting in an alleged loss of $550. Crocker also paid Rudyvk $220 to re-rent the property. In addition to these alleged damages, Crocker claimed that appellees sustained a "real loss" when he got a new tenant "into her place" rather than renting the new tenant one of appellees' other vacant apartments because they have a number of other rental properties and "always have empty apartments." He made no attempt to quantify the amount of that alleged loss.[6]

---

[6]Essentially, appellees argue that are they are lost volume sellers (or lost volume lessors). A lost volume seller has the capacity to perform the contract that was breached as well as other potential contracts due to its inventory. A lost volume seller does not

{¶47} We acknowledge that such a loss, assuming it existed, might be difficult to prove and quantify upon a breach. However, the Belmar apartment was not part of an apartment complex containing multiple, similar units. There is nothing in the record that indicates the extent to which the Belmar apartment may have been similar to other units appellees had available for rent. Real property is unique. It cannot be simply assumed that a tenant who was willing to rent the Belmar apartment would have been willing to rent another unit appellees had available for rent.

{¶48} Further, in considering whether the early termination provision is an enforceable liquidated damages clause or an unenforceable penalty, we find it significant that the parties' obligations under the early termination provision did not automatically "kick in" as soon as Oldendick notified Crocker of her anticipatory breach of the lease. The lease provides that, upon notice of early termination by the tenant, the lessor may agree to an early termination of the agreement, "if the lessor so chooses to agree to an early termination of the agreement." Accordingly, only if the lessor agreed to early termination, would the obligations set forth in that provision arise. If the lessor agreed to early termination, the tenant would be required to pay "a fee" of one month's rent "in addition to the regular rent until a tenant suitable to lessor executes a new lease term." If the lessor chose not to agree to an early termination, the lessor would have a claim for

---

minimize its damages following a breach of contract by entering into another contract because it would have had the benefit of both contracts — i.e., the profit from both contracts — if the first contract had not been breached.

breach of the lease and could recover its actual damages resulting from that breach (subject to its duty to mitigate its damages).

{¶49} In this case, appellees maintain that Crocker "agreed" to early termination of the lease on November 4, 2013, when he wrote to Attorney Kendrick "to confirm that the lease had been terminated."[7] This was nearly two weeks after he had re-rented the Belmar apartment to a new tenant, i.e., after he knew the losses appellees had sustained as a result of Oldendick's repudiation of the lease and the expenses appellees had incurred in finding a new tenant.[8]

---

[7]There is no evidence in the record of any express written or oral agreement by the parties to terminate the lease in accordance with the early termination provision. In their briefs, however, both parties acknowledge that (1) they agreed to an early termination of the lease and (2) the early termination provision, if enforceable, applies. The parties simply dispute when appellees agreed to early termination of the lease. Oldendick contends that appellees agreed to early termination "no later than September 20, 201[3]," when the premises was re-advertised for rental on Craigslist; appellees contend that they agreed to early termination of the lease on November 4, 2013, when Crocker sent his response to Attorney Kendrick. While we need not decide this issue here, clearly, the parties would have had to have agreed to early termination agreement before the new tenant took possession of the leased premises on November 1, 2013.

[8]At trial, Crocker testified that he did not expressly agree to terminate the lease under the early termination provision but that "it was just implied that the early termination agreement would kick in" once he found a new tenant for the Belmar apartment. As he explained:

Q. [Y]ou agreed then to cancel the lease, correct?
R. No, I did not.
Q. You did not. So you did not agree to an early termination of the lease?
A. Oh yeah. I guess. Right.
* * *
Q. You just said just a minute ago that you accepted, that you agreed to the termination of the lease. Is that a yes?
A. Yes.
* * *

**{¶50}** As applied in this case, the early termination provision enabled the lessor to take a "wait-and-see" approach. Where, as here, the lessor found a new, "suitable" tenant quickly, incurring minimal losses, it could agree to early termination and the tenant would be on the hook for an early termination fee of one month's rent plus the "regular rent until a tenant suitable to lessor executes a new lease term." If the lessor sustained greater losses or incurred greater expense in re-renting the property, it could refuse to agree to early termination and still recover the rent due under the lease until the premises were re-let and any other recoverable actual damages attributable to the tenant's breach of the lease (subject to its duty to mitigate its damages). As such, we conclude that, based on the particular facts and circumstances in this case, the early termination provision operated as a penalty. Because the early termination provision operated as a penalty, it was not enforceable, and Crocker was not entitled to deduct the early termination fee from Oldendick's security deposit under R.C. 5321.16(B).

---

Q. When did you convey to Ms. Oldendick that the lease was terminated, that you would agree to that termination of the lease?
A. I don't think I ever agreed that it was terminated, it was just implied that the early termination agreement would kick in and the rules of that agreement that she signed would be relevant to the situation. It would depend on how long it would take us to rent it, etcetera, etcetera, just like it says.
Q. But it says here that if you choose, the lessor chooses to agree on an earlier termination date, that's when the clause kicks i[n], correct?
A. Right.
Q. So if you didn't agree to terminate then this clause doesn't kick i[n], does it?
A. Right. Many landlords don't even abide by that.

**Double Damages under R.C. 5321.16(C) for Portion of Security Deposit Wrongfully Withheld**

{¶51} Oldendick argues that because the early termination fee was a penalty and was improperly deducted from her security deposit, she was entitled to recover all of her security deposit plus an equal sum as damages under R.C. 5321.16(C). We disagree.

{¶52} Where a landlord wrongfully withholds part of a security deposit, the landlord is liable for double damages under R.C. 5321.16(C) only as to the part of the security deposit that is wrongfully withheld by the landlord. *Vardeman*, 17 Ohio St.3d at 28-29, 476 N.E.2d 1038 (a landlord's failure to provide a tenant with a list of itemized deductions under R.C. 5321.16(B) "renders the landlord liable for double damages only as to the amount wrongfully withheld and not as to the entire amount of the security deposit"); *see also Calhoun*, 1992 Ohio App. LEXIS 1312, *7-8 (Mar. 26, 1992) (where tenants caused $100 in damages to rental property, tenants were entitled to an award of $300, two times $150 wrongfully withheld from $250 security deposit); *McGreevy v. Bassler*, 10th Dist. Franklin No. 09AP-381, 2010-Ohio-126, ¶ 14 (where evidence undisputedly demonstrated that appellee was responsible for a full month's rent of $535, which was offset against the security deposit of $535, none of the security deposit was wrongfully withheld); *Adaranijo v. Morris Inv. Co.*, 1st Dist. Hamilton No. C-070453, 2008-Ohio-2705 (where tenant breached the parties' lease agreement by vacating the rental premises early and landlord was unable to rent the premises for a period that

resulted in damages in excess of tenant's security deposit, tenant was not entitled to the return of the security deposit under R.C. 5321.16).

{¶53} In *Vardeman*, the Ohio Supreme Court defined the phrase "amount wrongfully withheld" in R.C. 5321.16(C) as the portion of the security deposit "found owing from the landlord to the tenant over and above any deduction that the landlord may lawfully make." *Id.* at 29. The court similarly defined the terms "amount due" in R.C. 5321.16(B) and "money due" in R.C. 5321.16(C) as "the security deposit, less any amounts found to be properly deducted by the landlord for unpaid rent and damages to the rental premises pursuant to R.C. 5321.16(B) or pursuant to the provisions of the rental agreement." *Vardeman* at 28-29. In other words, where a landlord fails to comply with R.C. 5321.16(B), a tenant may not collect double damages in the total amount of the entire security deposit, but only as to the amount of the security deposit the landlord "wrongfully withheld." *Vardeman* at 28-29; *Padgett*, 32 Ohio St.3d at 349, 513 N.E.2d 737.[9]

_____

[9]We note that the lease also contained a provision limiting what could be properly deducted from the security deposit. *See* Lease, Paragraph 4 ("TENANT[S] AGREE TO DEPOSIT WITH URBAN RESTORATION PROJECT THE SUM OF ONE MONTH'S RENT, PAYABLE BEFORE THEY OCCUPY SAID PREMISES. LESSOR MAY WITHHOLD FROM THESE DEPOSITS ONLY WHAT IS REASONABLY NECESSARY TO COVER THE FOLLOWING TENANT DEFAULTS: 1) DAMAGES TO THE DWELLING; 2) CERTAIN CLEANING COSTS FOLLOWING TENANTS DEPARTURE; AND 3) UNPAID RENT AND VARIOUS OTHER ACCRUED AND UNPAID CHARGES.") Oldendick does not argue that this provision of the lease provided additional restrictions, beyond that specified in R.C. 5321.16(B), regarding what appellees could lawfully deduct from her security deposit. Accordingly, we do not address that issue here.

{¶54} In this case, although the early termination provision was not enforceable, Crocker was still entitled to recover, and to deduct from Oldendick's security deposit, the actual damages caused by Oldendick's breach. *See, e.g., Carr v. Ed Stein Realtors*, 10 Ohio App.3d 242, 243, 461 N.E.2d 930 (9th Dist.1983) (where lease provision requiring forfeiture of security deposit was an unlawful penalty, tenant who did not give forwarding address was entitled to judgment of $29.28, the amount "wrongfully withheld" from her $175 security deposit after deducting landlord's actual damages of $116.60 in lost rent and $29.12 in advertising costs); *Vardeman*, 17 Ohio St.3d 24 at 27-29, 476 N.E.2d 1038; *see also Berlinger v. Suburban Apartment Mgt. Co.*, 7 Ohio App.3d 122, 125, 454 N.E.2d 1367 (8th Dist.1982) ("In the absence of a valid provision for liquidated damages, [landlord] was entitled to recover only the monetary equivalent of the actual damages caused by the appellant' breach.").

**Calculation of Damages**

{¶55} The trial court found that Crocker sustained a total of $770 in actual damages as a result of Oldendick's breach of the lease — $550 in lost rental income and $220 paid to Rudyvk to re-rent the property. Oldendick argues that the trial court "miscalculated" the actual damages sustained by appellees as a result of her anticipatory breach of the lease. She contends that instead of the $770 in actual damages found by the trial court, at most, she should have been liable for the $100 commission paid to Rudyvk upon the new tenant's execution of a lease.

**{¶56}** The appropriate standard of review when reviewing a determination of damages is the manifest weight of the evidence. *See, e.g., Shimrak v. Goodsir*, 8th Dist. Cuyahoga Nos. 103270 and 103395, 2016-Ohio-1467, ¶ 10; *Boice v. Emshoff,* 3d Dist. Seneca No. 13-98-23, 1998 Ohio App. LEXIS 6015, *24-25 (Dec. 3, 1998). A judgment supported by competent, credible evidence will not be reversed by a reviewing court as against the manifest weight of the evidence. *Seasons Coal Co. v. Cleveland*, 10 Ohio St.3d 77, 80, 461 N.E.2d 1273 (1984); *C. E. Morris Co. v. Foley Constr. Co.*, 54 Ohio St.2d 279, 376 N.E.2d 578 (1978), syllabus.

**{¶57}** Although the record contains competent, credible evidence to support the trial court's finding that appellees sustained $220 in re-rental expenses as a result of Oldendick's anticipatory breach of the lease, we find that the trial court's determination that appellees also sustained $550 in lost rental income was against the manifest weight of the evidence.

**{¶58}** In this case, the $50 difference between the monthly payment under Oldendick's lease and the monthly payment under the lease with the new tenant was due to the fact that Oldendick had a dog and the new tenant did not. The parties stipulated that the monthly *"rent* amount" under the lease was $800 "with an additional $60/month *fee* for [Oldendick's] dog." (Emphasis added.) Crocker testified that he adds a pet fee to the lease whenever a tenant has a pet because tenants with pets present particular risks — which he covers by charging the pet fee — that are not present when tenants do not have pets. Because the new tenant did not have a pet (and thus did not present the risks

to appellees covered by the fee), appellees sustained no actual loss when they re-rented the premises to the new tenant without collecting a pet fee.

**{¶59}** Accordingly, we find that Crocker wrongfully withheld $640 of Oldendick's security deposit ($860 security deposit less $220 in damages), entitling her to the $640 balance of her security deposit plus another $640 as "double damages," or a total of $1,280, under R.C. 5321.16(C). Thus, Oldendick is entitled to $1,280 in damages on her amended complaint for the wrongful withholding of her security deposit.

**Mitigation of Damages**

**{¶60}** Oldendick also claims that she is entitled to a refund of her prepaid October 2013 rent because appellees failed to make reasonable efforts to mitigate their damages. Once again, we disagree.

**{¶61}** When a tenant breaches a lease agreement by vacating the rental premises prior to the expiration of the lease term, the landlord must make "reasonable efforts" to mitigate damages sustained by the tenant's breach of the lease. *See, e.g., Oakwood Estates v. Crosby*, 8th Dist. Cuyahoga No. 85047, 2005-Ohio-2457, ¶ 11. A landlord is, however, not required to use "extraordinary efforts" or to "attempt the unreasonable or impractical" to find a new tenant. *Id.* at ¶ 12.

**{¶62}** The failure to mitigate damages is an affirmative defense. *Telecom Acquisition Corp. I v. Lucic Ents.*, 8th Dist. Cuyahoga No. 102119, 2016-Ohio-1466, ¶

Thus, the burden of proving a failure to mitigate damages lies with the party asserting the defense. *Id.* Whether a landlord made reasonable efforts to mitigate damages is a question of fact to be resolved by the trier of fact. *Cobblestone Square II Co. v. L&B Food Servs.*, 8th Dist. Cuyahoga No. 95968, 2011-Ohio-4817, ¶ 36; *Oakwood Estates* at ¶ 12. Accordingly, we will not reverse a trial court's finding as to reasonable efforts to mitigate damages if it is supported by competent, credible evidence in the record. *Oakwood Estates* at ¶ 12; *C.E. Morris Co.*, 54 Ohio St.2d at 280-281, 376 N.E.2d 578.

{¶63} Here, competent, credible evidence supports the trial court's determination that appellees did not fail to mitigate their damages. Crocker testified that within a few days after Oldendick notified Rudyvk that she no longer wanted to lease the Belmar apartment, he was actively seeking to re-rent the Belmar apartment, using the same advertising strategies that he used in leasing apartment to Oldendick and Ostrander. Crocker further testified that in a little over a month's time, Rudyvk had showed the apartment to eight prospective tenants and found a new tenant for the Belmar apartment at a monthly rate close to Oldendick's base monthly rate. Based on the evidence presented, we cannot say that the trial court erred in concluding that appellees did not fail to mitigate their damages.

### Appellees' Capacity to Sue on Their Counterclaim

{¶64} Oldendick also contends that the trial court erred in entering judgment in favor of appellees on their counterclaim and allowing them to set off their damages

against Oldendick's security deposit because appellees (1) were not named parties to the lease and (2) appellees lacked capacity to sue for breach of lease under R.C. 1329.10(B) because "Urban Restoration Project," the named lessor in the lease, was not registered with the Ohio Secretary of State. Although the trial court found in favor of appellees on their counterclaim, it awarded them no damages because it determined that they had already been fully compensated for their losses through the deductions from, or "set offs" against, Oldendick's security deposit.

{¶65} R.C. 1329.10(B), addressing capacity to sue, provides:

No person doing business under a trade name or fictitious name shall commence or maintain an action in the trade name or fictitious name in any court in this state or on account of any contracts made or transactions had in the trade name or fictitious name until it has first complied with section 1329.01 of the Revised Code and, if the person is a partnership, it has complied with section 1777.02 of the Revised Code, but upon compliance, such an action may be commenced or maintained on any contracts and transactions entered into prior to compliance.

{¶66} Thus, a person doing business under an unregistered, fictitious name lacks legal capacity to sue on any contract made in the fictitious name until the name is registered. *See, e.g., Frate v. Al-Sol, Inc.,* 131 Ohio App.3d 283, 288-289, 722 N.E.2d 185 (8th Dist.1999); *Ebner v. Caudill*, 93 Ohio App.3d 785, 787, 639 N.E.2d 1231 (10th Dist.1994) (where a landlord enters into a lease in a fictitious name, the landlord is prohibited from bringing an action based on the lease until the name is registered). However, once the name is registered, an action may be maintained on any contracts or transactions made in the name prior to compliance. *Frate* at 288. This is true even if a suit was commenced prior to compliance, so long as the name is registered before final

judgment. *Udrija v. Cleveland*, 8th Dist. Cuyahoga No. 102406, 2016-Ohio-288, ¶ 17; *MBA Realty v. Little G, Inc.*, 116 Ohio App.3d 334, 336-338, 688 N.E.2d 39 (8th Dist.1996).

{¶67} Although Urban Restoration Project was not registered with the secretary of state at the time appellees filed their counterclaim, the name was registered prior to final judgment. Accordingly, the lack of registration at the time the counterclaim was filed did not preclude an action for breach of the lease entered in the name of Urban Restoration Project.

{¶68} Appellees presented evidence that Crocker operated his rental business as Urban Restoration Project, i.e., that Crocker and Urban Restoration Project were one and the same. Doing business under another name does not create an entity distinct from the person operating the business. *Patterson v. V & M Auto Body*, 63 Ohio St.3d 573, 574-575, 589 N.E.2d 1306 (1992). As the Ohio Supreme Court explained in *Patterson*:

> A sole proprietorship has no legal identity separate from that of the individual who owns it. It may do business under a fictitious name if it chooses, but "* * * doing business under another name does not create an entity distinct from the person operating the business. The individual who does business as a sole proprietor under one or several names remains one person, personally liable for all his obligations. * * *" *Duval v. Midwest Auto City, Inc.*, 425 F.Supp. 1381, 1387 (D.Neb.1977).

*Patterson*, 63 Ohio St.3d at 574-575. Thus, Urban Restoration Project had no legal identity distinct from Crocker and Crocker, doing business as Urban Restoration Project, was both liable for the obligations entered into as Urban Restoration Project and entitled

to maintain an action for breach of the lease agreement entered into as Urban Restoration Project.

**{¶69}** Finally, although Oldendick claims that appellees were not entitled to recover on their counterclaim or to set off damages against her security deposit because they were not parties to the lease, they are the same parties Oldendick sued for the wrongful withholding of her security deposit and the return of the rent she paid under the lease. R.C. 5321.16 addresses the rights and obligations of landlords. In R.C. 5321.01, "landlord" is defined as "the owner, lessor, or sublessor of residential premises, the agent of the owner, lessor, or sublessor, or any person authorized by the owner, lessor, or sublessor to manage the premises or to receive rent from a tenant under a rental agreement." Given that appellees are "landlords" as used in R.C. 5321.16(B) and (C), they were both subject to liability for the wrongful withholding of Oldendick's security deposit under R.C. 5321.16(C) and entitled to "set off" the actual damages caused by her breach against her security deposit under R.C. 5321.16(B).

**{¶70}** Oldendick's first and second assignments of error are sustained in part and overruled in part.

**{¶71}** Judgment reversed. The case is remanded to the trial court with instructions to enter judgment in favor of Oldendick in the amount of $1,280 and for a determination of the reasonable attorney fees, if any, to be awarded Oldendick, pursuant to R.C. 5321.16(C), related to the litigation over the portion of the security deposit that was wrongfully withheld. *Smith*, 32 Ohio St.3d at 349, 513 N.E.2d 737 ("[T]he award of

attorney fees [under R.C. 5321.16(C)] must relate solely to the fees attributable to the tenant's security deposit claim under R.C. 5321.16, and not to any additional claims.").

It is ordered that appellant recover of appellees the costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate be sent to the municipal court to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.


_____
EILEEN A. GALLAGHER, PRESIDING JUDGE

MARY EILEEN KILBANE, J., CONCURS;
MELODY J. STEWART, J., CONCURS IN JUDGMENT ONLY


MELODY J. STEWART, J., CONCURRING IN JUDGMENT ONLY:

**{¶72}** I concur with the decision reached by the majority, but write separately to address the issue of the loss rental income.

**{¶73}** First off, I disagree with the majority that the agreed amount for rent was anything other than $860 a month: the amount stated in the lease. Furthermore, had Oldendick honored the lease and remained on the premises through the entire term of the agreement, there can be no argument made that the landlord would have been required to return any portion of the $600 ($50 x 12 months) regardless of whether any additional or extraordinary costs were incurred as a result of Oldendick's having a pet. The additional

$50 a month might certainly be viewed as pet rent, but it was nonetheless the rental amount agreed to by the parties. However, it appears that in order for Crocker to hold Oldendick responsible for any deficiency in the rent from the new tenant, Crocker would have had to inform Oldendick of such in order to recover any deficiency between the rental amounts in the event of breach.

{¶74} The standard rule in Ohio is that rent under a lease agreement is due until the end of the stated lease term or until the premises are relet with reasonable efforts, whichever occurs first. *Dennis v. Morgan*, 89 Ohio St.3d 417, 732 N.E.2d 391 (2000), syllabus. A tenant's breach does not terminate a lease agreement, rather the lease remains enforceable until the landlord finds a new tenant. *Hooper v. Seventh Urban, Inc.*, 70 Ohio App.2d 101, 434 N.E.2d 1367 (8th Dist.1980). Upon reletting, the tenant is generally discharged from any further obligations under the lease, including prospective rent. *Id.* Although the non-breaching party has a duty to take reasonable efforts to mitigate his damages, the non-breaching party is under no obligation to accept "any price" for the re-rental, rather it is sufficient to offer the rental unit to prospective tenants for the original price. *See UAP-Columbus JV326132 v. O. Valeria Stores, Inc.*, 10th Dist. Franklin No. 07AP-614, 2008-Ohio-588, ¶ 21.

{¶75} If the landlord wants to re-rent the premises for less than the original rent and get the benefit of the deficiency in rents, it appears that the landlord must take some action to preserve this right. A case from this court, albeit a very old case, explains this premise. In the case, a lessee executed an eight-year lease on a property and breached

six years in. The space remained vacant for three months before the landlord was able to find a tenant for the remainder of the lease. The landlord was able to rent the space to the new tenant per month for more than the breaching party's monthly rent. When the landlord brought suit to recover the three months of unpaid rent from the breaching party, the breaching party argued that his unpaid rent should be offset by the surplus in rent that the landlord would get from the new lessee. This court disagreed with that argument by explaining that if the situation were reversed and the landlord rented the space for less than the original monthly rent, the landlord, without prior agreement, could not sue on the deficiency. Specifically, this court stated:

> Now all the obligation of the defendant to the plaintiff had accrued prior to that time, and it was a subsisting obligation, and, had the landlord rented this property for a less sum of money than reserved in the former lease, without notifying the former tenant * * * that he expected to hold him for the balance of the rent, the mere assuming possession and leasing the property to another person would, *ipso facto*, release the former tenant from any further obligation to pay rent; and if the landlord had rented the property for, let us say, $ 100 a month, and then had sought to make up the difference against the former tenant, he would have been met by the insurmountable fact that he had assumed possession of the property and relet it to another tenant without any notice or reservation of his rights against the former tenant, and that would have been a complete answer to any suit that he might have predicated for the difference between what he got and what he was to have gotten under the old lease.

> Do not understand us to say that the landlord could not have entered into a contract with the new tenant in such manner that he could not retain his claim against the old tenant for the difference, but that could only be accomplished by giving notice, and giving the former tenant an opportunity to get a tenant at a higher rate. There is no doubt that this would be the

law in such an event. * * * For, in our judgment, had the landlord rented [the property] for a less sum, and signified his intention to hold the former lessees responsible for the difference, he could have done so.

*Schooley v. Wilker*, 33 Ohio App. 462, 466-467, 169 N.E. 829 (8th Dist.1929).

{¶76} I therefore agree that Crocker was not entitled to the $550.00 in lost rent, but for reasons different from that stated by the majority.