[Cite as *Levine v. Kellogg*, 2022-Ohio-3440.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| Steve Levine et al., | : | |
| Plaintiffs-Appellees, | : | |
| v. | : | No. 21AP-338 |
| | | (M.C. No. 2016CVF-27321) |
| Ken Kellogg, | : | |
| | | (REGULAR CALENDAR) |
| Defendant-Appellant. | : | |

D E C I S I O N

Rendered on September 29, 2022

**On brief:** *Law Office of Thomas Tootle Co., LPA, Thomas Tootle* for appellees, Steve and Sharon Levine. **Argued:** *Thomas Tootle.*

**On brief:** *Law Office of James P. Connors, James P. Connors*, for appellant. **Argued:** *James P. Connors.*

APPEAL from the Franklin County Municipal Court

MENTEL, J.

{¶ 1} Defendant-appellant, Ken Kellogg, appeals from the June 9, 2021 decision of the Franklin County Municipal Court finding for plaintiffs-appellees, Steve and Sharon Levine, on their action to recover a security deposit and against appellant on his counterclaim for breach of contract. For the reasons that follow, we affirm in part, and reverse in part.

## I. FACTS AND PROCEDURAL HISTORY

{¶ 2} This court set forth the facts and procedural history of this case in *Levine, v. Kellogg*, 10th Dist. No. 18AP-694, 2020-Ohio-1246 ("*Levine I*"). In *Levine I*, we wrote:

> On August 29, 2016, appellees filed a complaint against
> appellant alleging they had entered into a rental agreement
> with appellant for the residential premises located at 6764

Brampton Court, Dublin. Per the terms of the agreement, appellees gave appellant a security deposit in the amount of $1,570. It was alleged that appellees terminated the rental agreement on July 5, 2016, returning the premises to appellant "in the same or better condition as when the Rental Agreement began but for reasonable wear." (Compl. at ¶ 3.) According to the complaint, appellant failed to return the security deposit as required by the rental agreement. Appellees alleged a violation of R.C. 5321.16 and sought damages in the amount of $1,570, as well as an additional "statutory penalty" award of $1,570; appellees further sought the payment of reasonable attorney fees.

On November 29, 2016, appellant filed an answer and counterclaim. In the counterclaim, appellant alleged that pets belonging to appellees had "urinat[ed] and defecat[ed] in and around the indoors of the premises," and that appellees "were unable to completely remove the stains and odors." (Counterclaim at ¶ 15.) Appellant alleged he had presented a bill to appellees "demonstrating that he incurred damages in the total amount of $3,489," but that appellees "failed and refused to pay the damages which exceed the security deposit." (Counterclaim at ¶ 16.) It was further alleged appellees had failed to disclose damage to the garage door "caused by their Honda CRV or some other automobile striking the garage door while they were tenants in the premises." (Counterclaim at ¶ 17.) The counterclaim alleged causes of action for breach of contract and misrepresentation.

The matter came for a bench trial beginning March 1, 2018. Appellees presented the testimony of three witnesses, Kathie Underwood, and appellees Sharon and Steve Levine. Underwood, who manages residential rental properties, testified she had reviewed [p]laintiff's [e]xhibits B, E, and F, consisting of photographs and a video depicting the interior of 6764 Brampton Court. Underwood stated the wear and tear depicted in those exhibits was not unusual for carpeting of seven years or greater. When asked her opinion as to how often carpet is replaced in a leased premise, Underwood responded: "As a general rule, every seven to nine years." (Tr. at 23.)

From 2009 through 2016, appellee Sharon Levine (individually "Ms. Levine") and her husband resided at 6764 Brampton Court, renting the premises from appellant under a series of one-year lease agreements. At trial, Ms. Levine identified [p]laintiff's [e]xhibit A as a copy of the last lease agreement she and her husband signed (dated May 1, 2015) regarding the

property. In 2016, Ms. Levine and her husband notified appellant they would be vacating the residence at the end of the current lease. Appellant subsequently informed appellees he was "going to sell the home," and that "he wanted to bring in a realtor to discuss the proceedings for selling the home and what would happen as they were bringing people in to show the property." (Tr. at 60.) On April 30, 2016, appellant brought a realtor to the residence for a walk-through.

Appellees moved out of the residence on July 5, 2016. Appellees hired Stanley Steamer to clean the carpeting and the company provided carpet cleaning services on July 6, 2016. Ms. Levine denied any recollection of damage to the garage door and stated the door was functioning when they moved out.

On cross-examination, Ms. Levine testified she allowed her pet cats to roam freely around the house. When asked whether the pets urinated and defecated inside the property, she responded: "In the litter box, not on the carpet." (Tr. at 91.) Ms. Levine acknowledged the pets had vomited on the carpet. She denied attempting to remove cat urine and feces from the carpeting.

Appellee Steve Levine (individually "Levine") testified regarding his tenancy at 6764 Brampton Court, including the events surrounding the move out in 2016. Levine identified [p]laintiff's [e]xhibit D as photographs taken by a realtor, Carolyn Redinger, during a walk-through of the house in 2016. On the date appellees moved out of the residence (July 5, 2016), Levine did a walk-through of the premises with appellant. Levine testified that appellant indicated some areas were dirty. Levine patched a hole in the drywall caused by movers; he spackled over the work but did not paint over it. Levine subsequently received a letter from appellant, identified at trial as [p]laintiff's [e]xhibit K, citing several repairs appellant "wanted us to make after we moved out." (Tr. at 186.) Levine stated "[w]e had no idea there was a ding of any kind or dent or anything in that garage door." (Tr. at 183-84.)

On cross-examination, Levine testified that he "never saw the cats urinate in the home unless in the litter box," and "never saw them defecate in the home unless in the litter box." (Tr. at 192.) Levine agreed that it was his decision to have the carpets professionally cleaned prior to moving out.

Brian Deyo, the owner of Deyo Overhead Door Service, testified on behalf of appellant. Deyo identified [d]efendant's [e]xhibit Nos. 17 and 18 as photographs depicting the garage door of the residence he had "looked at last year." He noted damage to the

door, stating that "something * * * hit it from the inside because it was bowed out." (Tr. at 127.) According to Deyo, the damage reflected in the photographs was not normal wear and tear. On March 15, 2017, Deyo provided an estimate to appellant regarding the replacement of door panels in the amount of $899. On cross-examination, Deyo stated he had not performed any work on the garage door.

Edgar Ramirez, the owner of Ramirez Flooring, LLC, testified as to the condition of carpeting depicted in a series of photographs admitted as [d]efendant's [e]xhibit 15. He stated the carpet was "[v]ery dirty. It appeared to have pee from a dog or cat." (Tr. at 144.) Ramirez opined the condition of the carpet did not constitute reasonable wear and tear. He stated it is not possible to fully clean and return carpeting to its normal condition where stains from animal urine or defecation has remained on the carpet for a period of time, and that such carpet "should be replaced." (Tr. at 145.)

Ramirez identified an affidavit he signed providing an estimate to appellant for the installation of carpet and padding in two rooms of appellant's rental property. The estimate, prepared on March 14, 2017, was for the installation of "Mohawk berber" carpeting in the amount of $2,041.53. (Tr. at 142.) According to Ramirez, the typical life expectancy of a high-grade berber carpet from Mohawk is "30 years." (Tr. at 146.)

Redinger, a realtor with "[t]hirty plus years" experience, was involved in the sale of appellant's property. (Tr. at 222.) In April 2016, Redinger did a walk-through of the property with appellant, and took photographs at that time. Redinger testified that the carpeting "was heavily pet stained in the family room area." (Tr. at 226.) At trial, Redinger identified pet stains depicted in the photographs. Redinger expressed concern to the owners that "[p]et staining could affect the sale of the home." (Tr. at 227.) The carpet "was cleaned upon move-out," and Redinger took more photographs on July 7, 2016. (Tr. at 240.) She testified the photographs depicted stains remaining on the carpet. Redinger opined that "stains such as this do not come out, whether [or not] its professionally cleaned." (Tr. at 242.)

Redinger discussed three options with appellant and his wife for addressing the condition of the carpet relative to a house sale. The first option involved installing new carpet while the current tenants still occupied the premises, which involved the risk of "the pets * * * stain[ing] * * * all over again." A second option was to replace the carpeting after the tenants moved out, with the risk of uncertainty as to "how the market would be." A

final option was to "do a compensation for the carpet situation in pricing." (Tr. at 228.)

Redinger recommended reducing the listing price of the home by $3,000 (from $197,900 to $194,900) "to compensate for the carpeting." (Tr. at 229.) She stated the $3,000 figure represented "the amount of damage to reflect in the purchase price." (Tr. at 230.) According to Redinger, appellant received $3,000 less on the sale price of the property due to the staining on the carpet. Redinger obtained a buyer for the premises, and the buyers arranged to have the carpeting replaced prior to moving into the house.

Redinger testified the homeowners made concessions to the buyer on the sale with respect to foundation work in the basement, whereby appellant and his wife agreed to pay for repairs to the I-beams. During redirect examination, when asked whether the amount paid for repairs "would have been monies [the owners] had to pay in order to sell the house at the price that it sold for," Redinger responded "[y]es." (Tr. at 256.)

On cross-examination, Redinger did not recall "any problem with the garage door." (Tr. at 251.) According to Redinger, no one knew about an issue with the garage door at the time of the offer and acceptance in May 2016.

Amy Nagel resides on Brampton Court and when appellees were out of town she "would watch their cats and get their mail." (Tr. at 281.) She watched the cats approximately "[t]en times or more." (Tr. at 282.) According to Nagel, the cats "had free roam of the house." (Tr. at 288.) She testified that "[o]n an occasion or two when I would watch them I would have to clean up poop or puke." (Tr. at 290.) Nagel observed stains downstairs, which she described as "[s]taining from a pet," and which she did not consider to be normal wear and tear. (Tr. at 289.) Nagel subsequently noticed "[d]ark spots * * * in the family room" when she would "go down to clean the kitty litter box." (Tr. at 290-91.)

Molly Kellogg, appellant's wife, testified she and her husband lived at the Brampton Court residence from 1992 until 2009. In 2001, Kellogg and appellant installed "Mohawk berber * * * high grade carpet" with "a 25-year warranty." (Tr. at 301.) In 2009, Kellogg and appellant decided to rent out the house and appellees began tenancy that year. Kellogg identified photographs taken of the residence in 2009 and described the condition as "immaculate" when they moved out. (Tr. at 304.)

Kellogg went to the house on July 7, 2016 and observed the carpet "was very well-stained." (Tr. at 309.) Kellogg "was quite

upset" because she "thought the carpets had been cleaned. It looked * * * like there was still heavy staining for having the carpets being cleaned." (Tr. at 311.) Kellogg prepared a letter to appellees outlining damages, including a cleaning charge of $100 and a charge of $75 to repair drywall damage. Kellogg testified the total damages exceeded the amount of the security deposit.

Kellogg and appellant met with Redinger in April 2016 to begin the process of selling the residence. Redinger "mentioned to us that the carpet in the middle bedroom and, in particular, the family room was heavily stained. And when we were discussing the listing price of the home, she mentioned that we could either ask a listing price and replace the carpet or we could lower the price of the home by $3,000 and allow the buyer to put their own carpet in." Kellogg and appellant "decided to lower the asking price of the home so a buyer could replace the carpet or flooring as they needed." (Tr. at 315.)

Kellogg and appellant listed the home for $194,900. The buyers requested Kellogg and appellant remedy a structural issue in the basement as "some I-beams needed to be replaced." They paid a contractor "just over $3,000" to remedy the issue. (Tr. at 316.) Kellogg and appellant also paid to remedy a radon issue, and "then increase[d] the * * * listing price of the home to accommodate for that." (Tr. at 316-17.) Kellogg testified they suffered a $3,000 loss as a result of the carpeting, and that they would have otherwise listed the house for $197,900.

On cross-examination, Kellogg testified the carpet was installed in 2001, and that the carpeting was 15 years old when appellees moved out. Kellogg did not have an invoice for the Mohawk carpet that was originally installed.

Appellant, who testified on his own behalf, stated the carpeting he and his wife installed in the Brampton Court residence was made by Mohawk and carried "a 25-year guarantee." (Tr. at 329.) According to appellant, there were no problems with the carpeting in 2009, and the house was in "immaculate, excellent condition" at that time. (Tr. at 328.)

In April 2016, after appellant and his wife made the decision to sell the residence, he was surprised to see dark stains in the family room. On two occasions, appellant observed "poop right outside of the litter box on the family room carpet." Appellant also observed that someone had placed tea bags on the carpet, and his realtor explained the purpose of using tea bags in such a manner was "to pull odors and potential stains out of the carpet." (Tr. at 345.)

Redinger, recommended three options to address the condition of the carpet; replace the carpeting while the tenants were still there, install new carpeting after the tenants vacated, or "have the buyer make their own decision what they want to do and * * * just devalue by $3,000." (Tr. at 347.) Based on Redinger's advice, appellant and his wife reduced the price of the house by $3,000 due to the condition of the carpet. Appellant testified that the selling price of the home eventually increased by approximately $3,000 after he paid for remedies related to a radon system and the installation of I-beams on a basement wall. []

Appellant prepared a list of items that needed repair at the time appellees moved out. Appellant discussed the carpet stains with Levine during the walk-through on July 5, 2016. According to appellant, the stains did not come out even after the professional cleaning. He further testified there was a dent on the left side of the garage door.

On cross-examination, appellant testified he did not have a copy of the Mohawk carpet warranty or the original invoice. Appellant did not replace damaged tiles in the kitchen, nor did he replace the garage door; he stated the damaged garage door did not affect the sale price of the residence. Appellant testified the buyer made an offer of $194,900, but the house sold for $197,900 because "there was a seller concession of closing costs." (Tr. at 402.) According to appellant, the buyer was unaware of a foundation issue when they made their initial offer. Appellant acknowledged he never provided appellees 72-hour written notice concerning landscaping issues.

By entry filed September 10, 2018, the trial court found in favor of appellees on their claim appellant wrongfully withheld the security deposit, and the court further found against appellant on his counterclaim. By separate entry also filed on September 10, 2018, the trial court awarded appellees attorney fees in the amount of $12,957.

*Levine I* at ¶ 2-29.

{¶ 3} On September 10, 2018, appellant filed a timely appeal of the trial court's decision asserting seven assignments of error. On September 20, 2018, appellees filed a cross-appeal asserting a single assignment of error regarding the trial court's reduction of attorney fees. On March 31, 2020, this court sustained in part, and overruled in part, appellant's first assignment of error; sustained appellant's second and third assignments of error; overruled appellant's fifth and sixth assignments of error; and rendered appellant's

fourth and seventh assignments of error, as well as appellees' single assignment of error, moot. Relevant to the instant appeal, we found that the trial court erred by applying the improper measure of damages as the fact that appellant failed to replace the damaged carpeting was not dispositive of whether he could prove actual damages. We wrote, "the proper measure of damages would be the lesser of the cost of repair and the difference in market value caused by the damage." *Levine I* at ¶ 50. We concluded, therefore, that the case must be remanded for the trial court to determine "upon consideration of a 'reasonable wear and tear standard,' *Bibler* at ¶ 20, whether the tenants may be subject to liability for extraordinary damages under R.C. 5321.05, and in the event the evidence supports such a determination, for application of the appropriate measure of damages for temporary injury to property." *Levine I* at ¶ 57.

{¶ 4} On June 9, 2021, the trial court rendered a decision in this case. The trial court found in favor of appellees on their complaint to recover the security deposit and against appellant as to his counterclaim. The trial court concluded that while the stained carpet exceeded reasonable wear and tear, "[g]iven the advanced age of the carpet when Plaintiffs moved out (15 years) and the expected life span of carpet in a rental property (approximately 8 years), the Court finds that the difference in market value caused by Plaintiffs' damage is $0." (June 9, 2021 Decision at 3.) As for the other alleged damages, the trial court found, "Defendant failed to prove a reduction in the market value of the property caused by Plaintiffs, nor did Defendant actually show the cost of repair for the drywall, screens, and kitchen tile." (June 9, 2021 Decision at 4.) As such, the trial court concluded that defendant did not meet his burden in submitting evidence of reasonable cost of repair or replacement to abate the alleged damages to the premises. *Id.*

{¶ 5} Appellant filed a timely appeal.

## II. ASSIGNMENTS OF ERROR

{¶ 6} Appellant assigns the following as trial court error:

> 1. The trial court erred by again granting judgment in favor of appellees on their claim for return of a security deposit and on appellant's counterclaim for damages under the lease agreement and R.C. 5321.05.

> 2. The trial court erred by again finding, as a matter of law, that appellant, as landlord, did not incur any damages, and further,

by failing to grant appellant any damages arising from the lease agreement and R.C. 5321.05.

3. The trial court erred on remand by again failing to apply the correct measure of damages.

4. The trial court's judgment on remand for appellees on their security deposit claim and against the landlord appellant on his counterclaim for damages under the lease and R.C. 5321.05 was against the manifest weight of the evidence and this Court's instructions for further proceedings on remand.

5. The trial court erred by again finding as a matter of law on remand that "The reasonable life of this carpet was approximately eight years," because this finding is unsupported by any admissible evidence or Ohio law.

6. The trial court erred by granting attorney fees to appellees.

## III. LEGAL ANALYSIS

### A. Appellant's First, Second, Third, and Fourth Assignments of Error

{¶ 7}  For harmony of analysis, we will address appellant's first four assignments of error together.  Appellant argues (1) the trial court erred granting judgment in favor of appellees on their claim for the return of a security deposit and on appellant's counterclaim for damages under the lease agreement and R.C. 5321.05; (2) the trial court erred by finding appellant did not incur any damages; (3) the trial court erred by again failing to apply the correct measure of damages; and (4) the trial court's judgment on remand was against the manifest weight of the evidence.

{¶ 8}  As an initial matter, we note that appellant's brief fails to comply with App.R. 16 as it did not separately argue his first three assignments of error.  Pursuant to App.R. 16(A)(7), each assignment of error must include "[a]n argument containing the contention of the appellant with respect to each assignment of error presented for review."  While an appellate court may address assignments of error together, the parties do not have this choice and are required to argue each assignment of error separately in their brief. *Maiorana v. Walt Disney Co.,* 10th Dist. No. 20AP-207, 2021-Ohio-4530, ¶ 17, citing *Fiorilli Constr., Inc., v. A. Bonamase Contracting, Inc.,* 8th Dist. No. 94719, 2011-Ohio-107, ¶ 30.  While App.R. 12(A) permits this court to disregard an assignment of error not separately argued in the brief, in the interests of justice, we will address appellant's

arguments as to the trial court's determination regarding the measure and amount of damages.

{¶ 9} Disputes between a landlord and tenant are governed by R.C. 5321, which is commonly referred to as the Ohio Landlord-Tenant Act. *Whitestone Co. v. Stittsworth*, 10th Dist. No. 06AP-371, 2007-Ohio-233, ¶ 7, citing *Vardeman v. Llewellyn*, 17 Ohio St.3d 24, 26 (1985). The statute sets forth the law concerning rental agreements for residential properties, as well as the rights and responsibilities of landlords and tenants. *Id.*

{¶ 10} In relevant part, R.C. 5321.16 provides:

> (B) Upon termination of the rental agreement any property or money held by the landlord as a security deposit may be applied to the payment of past due rent and to the payment of the amount of damages that the landlord has suffered by reason of the tenant's noncompliance with section 5321.05 of the Revised Code or the rental agreement. Any deduction from the security deposit shall be itemized and identified by the landlord in a written notice delivered to the tenant together with the amount due, within thirty days after termination of the rental agreement and delivery of possession.
>
> * * *
>
> (C) If the landlord fails to comply with division (B) of this section, the tenant may recover the property and money due him, together with damages in an amount equal to the amount wrongfully withheld, and reasonable attorney fees.

{¶ 11} Pursuant to R.C. 5321.16(B), a landlord must return a security deposit unless those funds are utilized for past due rent or reduced by damages from the landlord based on a tenant's failure to maintain the property. *Levine I* at ¶ 37, quoting *Warner v. Evans*, 9th Dist. No. 27536, 2015-Ohio-2022, ¶ 7. R.C. 5321.05 governs the tenant's obligation regarding upkeep and maintenance of the premises.

{¶ 12} R.C. 5321.05 states in part:

> (A)   A tenant who is a party to a rental agreement shall do all of the following:
>
> * * *
>
> (6) Personally refrain and forbid any other person who is on the premises with his permission from intentionally or negligently destroying, defacing, damaging, or removing any fixture, appliance, or other part of the premises;
>
> * * *

> (C)(1) If the tenant violates any provision of this section, other than division (A)(9) of this section, the landlord may recover any actual damages that result from the violation together with reasonable attorney's fees.

{¶ 13} Under Ohio law, a tenant must return the premises to the landlord in substantially as good a condition as when it was received. *Hensel v. Childress*, 1st Dist. No. C-180100, 2019-Ohio-3934, ¶ 26, citing *Bibler v. Nash,* 3rd Dist. No 5-05-09, 2005-Ohio-5036, ¶ 18. A landlord can only recover damages from a tenant for violations of R.C. 5321.05 or based on violations of the lease. *Levine I* at ¶ 40, citing *Kelley v. Johnston*, 4th Dist. No. 01CA5 (Nov. 14, 2001). A tenant is liable for extraordinary damages that exceed ordinary wear and tear. *Hensel* at ¶ 26, citing *Bibler*, at ¶ 18. Moreover, the landlord bears the burden of demonstrating sufficient evidence to link any of the alleged damages to the tenant's failure to meet their obligations under R.C. 5321.05 or the lease agreement. *Whitestone* ¶ 27, citing *Zilka v. Asberry*, 6th Dist. No. H-04-022, 2005-Ohio-1881, ¶ 9. In order to meet this burden, " 'the landlord must generally present evidence regarding the condition of the premises both before the tenant moves in and after he moves out.' " *Levine I* at ¶ 40, quoting *Estie Invest. Co. v. Braff*, 11th Dist. No. 2017-L-172, 2018-Ohio-4378, ¶ 26.

### 1. Measure of Damages

{¶ 14} Preliminarily, we will address appellant's argument in his third assignment of error contending the trial court applied the incorrect measure of damages. "An appellate court reviews a question of law challenging the trial court's measure of damages de novo." *MacDonald v. Authentic Invs., LLC*, 10th Dist. No. 15AP-801, 2016-Ohio-4640, ¶ 40. In a landlord-tenant dispute the measure of damages, "would be the lesser of the cost of repair and the difference in market value caused by the damage." *Levine I* at ¶ 50. A landlord, however, is not entitled to recover damages for repairs to property when the damage was the result of ordinary wear and tear. *Whitestone* at ¶ 27, citing *Bibler* at ¶ 18. Upon review, we find the trial court, remedied its initial error—discussed at length in *Levine I*—by applying the correct measure of damages. *See* June 9, 2021 Decision at 2. ("[T]he proper measure of damages would be the lesser of the cost of repair and the difference in market

value caused by the damage.")  Because the trial court applied the correct measure of damages in this case, we find appellant's argument without merit.[1]

{¶ 15} Accordingly, appellant's third assignment of error is overruled.

## 2. Amount of Damages

{¶ 16} Appellant argues in his first, second, and fourth assignments of error that the trial court erred in the amount of damages awarded to the parties concerning alleged damages to various areas of the property.

{¶ 17} The award of damages in a landlord-tenant matter is reviewed under a manifest weight of the evidence analysis. *Levine I* at ¶ 33, quoting *Hensel,* at ¶ 24.  While a challenge to the sufficiency of the evidence is a question of law, a challenge to manifest weight of the evidence raises a question of fact. *Timoneri v. NorthSteppe Realty, Inc.*, 10th Dist. No. 15AP-618, 2016-Ohio-5901, ¶ 36, citing *State v. Thompkins*, 78 Ohio St.3d 380, 386-87 (1997).  When a reviewing court considers whether a civil judgment is against the manifest weight of the evidence, we presume the findings of the trier of fact are accurate. *Schultz v. Wurdlow*, 10th Dist. No. 11AP-62, 2012-Ohio-3163, ¶ 15, citing *Seasons Coal Co., Inc. v. Cleveland*, 10 Ohio St.3d 77, 79-80 (1984). " 'Civil "[j]udgments supported by some competent, credible evidence going to all the essential elements of the case will not be reversed by a reviewing court as being against the manifest weight of the evidence." ' " *Schultz* at ¶ 15, quoting *Cunningham v. Ohio Dept. of Transp.*, 10th Dist. No. 08AP-330, 2008-Ohio-6911, ¶ 20, quoting *C.E. Morris Co. v. Foley Constr. Co.*, 54 Ohio St.2d 279 (1978), syllabus.

{¶ 18} When evidence is susceptible to more than one construction, a reviewing court is bound to give it that interpretation which is most favorable to sustaining the judgment. *Schultz* at ¶ 15, citing *Seasons Coal Co.* at fn. 3, quoting 5 Ohio Jurisprudence 3d, Appellate Review, Section 603, at 191-92 (1978).  "[E]very reasonable intendment and every reasonable presumption must be made in favor of the judgment and the finding of facts."  (Further citations omitted.)  *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, ¶ 21.  A reviewing court may not substitute its judgment for that of the trial court.

---

[1] Appellant argues that the trial court erred in its measure of damages because it found he was not entitled to any damages.  Appellant conflates the measure of damages with the amount of damages at issue.  We address the trial court's determination of the amount of damages regarding each alleged area of the home that was damaged in the subsequent section.

*McGreevy v. Bassler*, 10th Dist. No. 09AP-381, 2010-Ohio-126, ¶ 8; *see also Myers v. Garson*, 66 Ohio St.3d 610, 616 (1993) ("hold[ing] that an appellate court must not substitute its judgment for that of the trial court where there exists some competent and credible evidence supporting the findings of fact and conclusions of law rendered by the trial court").

{¶ 19} In the case sub judice, the lease agreement between the parties provided for a security deposit of $1,570. Addendum C to the lease agreement, titled "PET AGREEMENT," required an additional deposit of $150 with respect to two cats and included language stating that "resident agrees to immediately pay for any damage, loss or expense caused by their pet." Appellant has asserted at various stages in this case damages to the following areas of the property: stains in carpeting; a dent in the garage door; a cleaning fee; cracks in the kitchen tiles; drywall repair; window screen replacement; landscape costs; a cost of replacement for the washing machine; and costs of replacement for the dishwasher. We will address each part of the home that was allegedly damaged in turn.

### a. Carpeting

{¶ 20} We will first consider the trial court's award of $0 to appellant for damage to the carpet. In its June 9, 2021 decision, the trial court found that the stains on the living room carpet exceeded ordinary wear and tear while appellees were in possession of the property. When determining the amount of damages, the trial court concluded that given the expected life span of the carpet at issue, approximately 8 years, and the age of the carpet when appellees moved out, 15 years, the value of the carpet was $0. The trial court explained that, regardless of the stains, the carpet would have needed to be replaced when appellees moved out of the property and that the amount appellant claimed was owed for the carpet was not reasonable. (June 9, 2021 Decision at 3, citing *Martin v. Design Constr. Servs.*, 121 Ohio St.3d 66, 2009-Ohio-1, ¶ 25.)

{¶ 21} As it is inconsequential to the ultimate resolution of this case, we will operate with the assumption that the trial court's determination that the pet stains in the carpet exceeded ordinary wear and tear was based on competent, credible evidence. Consequently, the first question we must consider is what is the maximum amount of potential damages, prior to a determination of any depreciation in value, for the carpet. At

trial, appellant's realtor, Carolyn Redinger, testified to recommending a reduction of the listing price of the home by $3,000 to account for the stained carpeting. Edgar Ramirez, appellant's carpet expert, testified that the estimate, prepared on March 14, 2017, for the installation of "Mohawk berber" carpeting totaled $2,041.53. (Tr. at 142.) As set forth previously, "the proper measure of damages would be the lesser of the cost of repair and the difference in market value caused by the damage." *Levine I* at ¶ 50. Upon review, and as acknowledged in appellant's reply brief, the maximum amount of potential damages for the carpet would be "$2,041.53 in damages related to the carpet as the lesser of the cost of repair and the difference in market value, $3,000." (Appellant's Reply Brief at 9.)

{¶ 22} Taking the maximum potential damages of $2,041.53 for the carpet into account, we now consider the trial court's determination concerning the pro-rated value of the carpet based on depreciation. Appellant appears to argue that he is entitled to the full value of the carpet as it was "undisputedly in excellent and immaculate condition when initially rented to the appellees." (Appellant's Brief at 11.) At trial, appellant identified photographs taken of the residence in 2009 and described the carpet's condition as "immaculate" when he moved out. (Tr. at 304.) Appellant presented expert testimony by Mr. Ramirez that when appellees moved out, the carpet was "[v]ery dirty" and "appeared to have pee from a dog or cat." (Tr. at 144.) Ramirez stated the stains in the carpet did not constitute reasonable wear and tear, and it "should be replaced." (Tr. at 145.) Ramirez testified that the typical life expectancy of a high-grade berber carpet from Mohawk, is "30 years." (Tr. at 146-47.) Conversely, Mr. Levine described the carpet when they moved in as "fine" and noted that in one of the pictures "the carpeting was coming up a little there, a little wear and tear." (Tr. at 189.) Appellees' expert witness, Ms. Underwood, as reflected in the initial pictures, also characterized the carpet, as "fine." (Tr. at 38.) Underwood testified the reasonable life of carpet was 7-9 years. (Tr. at 23.) Underwood also testified that it is customary to charge tenants, if there is damage that exceeds ordinary wear and tear, a "pro-rated" amount based on the "life expectancy of the carpet" accounting for depreciation. (Tr. at 26.)

{¶ 23} After review of the evidence, it is clear from the facts of the case, even if accepting the carpet initially carried thousands of dollars in value when it was purchased, given the age of the carpet, appellees would be entitled to some reduction in the amount of

damages based on depreciation in value of the carpet. As noted in *Levine I*, "Courts have held, however, that claims for damages such as replacement carpet should account for " 'depreciation due to reasonable wear and tear, quality, and life expectancy of the carpet.' " *Levine I* at ¶ 57, fn. 3, quoting, *Calanni v. Stowers*, 8th Dist. No. 106618, 2018-Ohio-4025, ¶ 48. Moreover, it is also clear that the trial court's conclusion that appellant was entitled to $0 was based on Underwood's pro-rated methodology in her calculation of the amount of damages. The trial court is well within its authority to find Underwood's testimony was credible and rely on her expert opinion in its decision. "It is settled law that the finder of fact is free to believe all, part, or none of the testimony of the witnesses who appear before it." *Whitestone* at ¶ 32, quoting *State v. Wiley*, 10th Dist. No. 03AP-340, 2004-Ohio-1008, ¶ 48. The trial court's conclusion that the reasonable life of the carpet was 8 years falls squarely within Underwood's testimony that the reasonable life of the carpet was 7-9 years. While Ramirez testified that carpet had a reasonable life expectancy of 30 years, the trial court elected to give Underwood's testimony on this issue more weight. Taking this all into account, we find that the trial court's conclusion was based on competent, credible evidence as the age of the carpet was nearly double its reasonable life expectancy.

{¶ 24} Appellant argues "[t]here was no evidence presented that the Mohawk carpet at issue in this case needed to be replaced due to its age." (Appellant's Reply Brief at 5.) We disagree. At trial, Underwood testified to this very question:

> Q: And is it your testimony that *this carpeting* would have needed to be replaced at seven years notwithstanding the existence of any pet stains or carpeting?
>
> A: Yes

(Emphasis added.) (Tr. at 26.)

{¶ 25} Appellant also argues that the life expectancy of the carpet could not be 7-9 years because he had a 25-year warranty. We find this argument unpersuasive. Appellant provided no documentation to substantiate this claim, and the trial court gave no weight to appellant's testimony as to the warranty. As a reviewing court, we must not substitute our judgments for that of the trial court and are limited to determining whether the amount of damages is against the manifest weight of the evidence. Furthermore, it is well established law that if the trial court in a bench trial finds appellant's estimation of damages inflated it has the discretion to adjust the damages. "[I]f the trier of fact believes the evidence

regarding the cost of repair has been inflated, the trier of fact always has the discretion to adjust the damages accordingly." *Whitestone* at ¶ 28, citing *Prawdzik v. II Enterprises, Inc.,* 10th Dist. No. 03AP-1044, 2004-Ohio-3318, ¶ 14. As there is some competent, credible evidence going to the essential elements of the case, we cannot say that any part of the trial court's judgment as to the amount of damages for the carpet is against the manifest weight of the evidence. *C.E. Morris Co.,* 54 Ohio St.2d 279 (1978).

### b. Garage Door and Floor Tiles

{¶ 26} We turn now to alleged damages to the garage door. The trial court concluded that there was no "external visible damage to the garage door and that the garage door operates." (June 9, 2021 Decision at 3.) The trial court alternatively found that, even if there was damage to the garage door, the damage was reasonable wear and tear.

{¶ 27} The parties presented two distinct positions concerning the state of the garage door when appellees vacated the property. Appellant argues that there was significant damage to the garage door. Appellant's expert, Brian Deyo, identified photographs depicting the garage door of the residence. Deyo testified that "something * * * hit [the garage door] from the inside because it was bowed out." (Tr. at 127.) According to Deyo, the damage to the garage door was not normal wear and tear and provided an estimate to appellant regarding the replacement of the door panels. On cross-examination, Deyo acknowledged that he had not performed any work on the garage door.

{¶ 28} Conversely, Ms. Levine testified that the garage door worked when she moved out. When asked if Ms. Levine noticed "any visible damage from the exterior" of the garage door, she responded "No." (Tr. at 73.) Mr. Levine testified that he was not aware of a "ding" or damage to the garage door when he moved out. (Tr. at 182.) Mr. Levine stated that appellant made no mention of a "ding" during the walk-through. (Tr. at 182-83.) "We had no idea there was a ding or any kind of dent or anything in that garage door. When we left, [w]e -- remote we actually received when we moved in, we pressed it, went up, we pressed it and it went down; nobody noticed any ding with that garage door. We didn't notice it. My wife didn't notice it. The property owner didn't notice it. The realtor didn't notice it. No one noticed it." (Tr. at 183-84.) Mr. Levine later noted that "if they did notice it, we would have heard about it." (Tr. at 210.) Here, the trial court believed appellees' testimony and found there was no external visible damage to the garage door. Under a manifest

weight analysis, when evidence is susceptible to more than one construction, a reviewing court is bound to give it that interpretation which is most favorable to sustaining the judgment. *Schultz* at ¶ 15, quoting *Seasons Coal Co.* at fn. 3, quoting 5 Ohio Jurisprudence 3d, Appellate Review, Section 603, at 191-92 (1978). Given these facts, the trial court's decision that there was no external visible damage to the garage was based on competent, credible evidence and was not against the manifest weight of the evidence.

{¶ 29} Regardless of the trial court's conclusion that there was no visible damage to the garage door, appellant has failed to demonstrate that it incurred any actual monetary damages. In *Levine I*, this court wrote "while appellant presented testimony that the condition of the carpet resulted in a decision to reduce the sale price of the residence, the evidence does not indicate that purported damage to the garage door resulted in a reduction of the sale price. Rather, appellant's realtor testified that no one was aware of an issue with the garage door at the time of the acceptance of the offer to purchase the home. Appellant, who stated he did not replace the garage door, similarly testified that any damage to the garage door did not affect the sale of the residence." *Levine I* at ¶ 48, fn. 2. When asked if the allegedly damaged garage door provided any basis for the reduction in the sales price of the home, appellant responded, "Your Honor, it did not." (Tr. at 397.) While appellant repeatedly cites "the repair cost for the damaged panels was $899" and the replacement cost "for the entire garage door was $1,249," appellant never incurred any costs from the repair or replacement of the garage door. (Appellant's Brief at 23.) Because appellant did not repair or replace the garage door or suffer a diminution in the market value of the home from the garage door, he has failed to demonstrate that he is entitled to any damages.

{¶ 30} Appellant's argument concerning the floor tiles fails on similar grounds. The trial court determined that appellant wrongfully withheld $165 of appellees' deposit for damage to kitchen tiles as the evidence indicated that the minor cracks in the tiles constituted reasonable wear and tear. The trial court alternatively found that, even if the cracks exceeded reasonable wear and tear, appellant "produced no evidence as to the replacement cost or the difference in market value caused by the damage." (June 9, 2021 Decision at 4.)

{¶ 31} After careful review of the evidence, we find the trial court's decision to award no damage for the floor tiles was based on competent, credible evidence. First, Mr. Levine

disputed any meaningful damage to the floor tiles stating "there was like a little chip but I don't know how that happened, not the cats. They have paws. It doesn't work for them." (Tr. at 212.) Appellant, however, believed that these floor tiles were damaged beyond ordinary wear and tear. "There were three tiles, Your Honor, that when the Levines accepted the property, there was no damage to the tile. There was one cracked tile and then two others had chips in them." (Tr. at 351.) Thus, the parties presented the trial court with competing evidence as to the condition of the kitchen tiles. The trial court, in its assessment of the evidence, found appellees more credible than appellant. As there is credible, competent evidence in the record to support the trial court's conclusion, we are not persuaded that the trial court's decision was against the manifest weight of the evidence. Arguendo, even if appellant is correct that the damage to the floor tile exceeded ordinary wear and tear, appellant incurred no actual damages as he did not replace the tiles or suffer a diminution in market value as the price of the property was only reduced based on the carpet.

{¶ 32} Appellant argues that the lease specifically calls for replacement of tiles, at $55 per tile, if they are damaged during the tenancy. However, liquidated damages in a landlord-tenant lease for predetermined monetary damages provisions, outside actual damages to the property, are generally not enforceable. *Riding Club Apts. v. Sargent*, 2 Ohio App.3d 146 (10th Dist.1981)[2]; *see also Oldendick v. Crocker*, 8th Dist. No. 103384, 2016-Ohio-5621, ¶ 35-37, quoting *Ritter v. Fairway Park Props., L.L.C.*, 9th Dist. No. 21509, 2004-Ohio-2518, ¶ 12 (finding a liquidated damages clause stating predetermined money damages, independent of any actual damage to the rental property, "is violative of R.C. 5321.16(B) which requires a list of actual damages"). Accordingly, we find the trial

---

[2] In *Riding Club*, this court wrote:

> A liquidated damages clause permitting the landlord to retain a security deposit without itemization of actual damages caused by reason of the tenant's noncompliance with R.C. 5321.05 or the rental agreement is inconsistent with R.C. 5321.16(B), which requires itemization of damages after breach by the tenant of the rental agreement. Since the provision is inconsistent with R.C. 5321.16(B), it may not be included in a rental agreement and is not enforceable. R.C. 5321.06. It is immaterial that the liquidated damages clause might otherwise be enforceable as such rather than being found to be a penalty.

*Riding Club* at 147.

court's determination to award no damages to appellant for the garage door and floor tiles was not against the manifest weight of the evidence.

### c. Cleaning Fee and Drywall

{¶ 33} Next, we address appellant's claim for damages incurred from drywall repairs and cleaning of the property. The trial court found that appellant was not entitled to damages as to the cleaning fee because appellees hired a professional cleaning company to clean the home upon moving out and left the residence in acceptable condition. The trial court also found appellant was not entitled to withhold $75 of appellees' deposit as he failed to meet his burden in demonstrating that there was damage to the drywall. The trial court found Mr. Levine's testimony that he repaired the drywall more credible than appellant's testimony that he spent three hours repairing the wall.

{¶ 34} Appellant repeatedly stated—in large bold font—that the trial court erred as these charges were undisputed, and "appellees admitted they did not seek to recover this part of the security deposit and admitted that appellant's charges for these items was (sic) reasonable." (Bold removed.) (Appellant's Brief at 24.)

{¶ 35} Appellant's interpretation of the testimony misconstrues the facts of the case and ignores common sense. Appellant's contention originates from testimony concerning an email between the parties, admitted at trial as Exhibit E, when appellees were in the process of vacating the property. The email indicates that appellant contacted appellees regarding a hole in the wall that needed repair. Ms. Levine explained her prior "concession" stating:

> Yes, because the movers were going to repair the wall and he would not allow it in the time frame since they were selling the house so it was either fix it and you don't charge us the $75 but the movers could not fix it that day. So he said then he was going to charge us $75 so I am responding after I had talked to the movers when they would be able to fix the wall because they were taking responsibility of the hole in the wall.
>
> So you -- Ken gave us a choice: Either you fix it that day or we're taking $75 out of the security deposit.

(Tr. at 103.)

{¶ 36} Mr. Levine testified that, prior to vacating the property, he completed the drywall repairs. While it appears appellees initially indicated they would not dispute these

charges, it is clear that they later decided to challenge the entirety of the withholding of the security deposit, including fees for drywall repairs and cleaning. This was evident in the language employed in the complaint. *See Compl.* at ¶ 2,6 ("As provided by the terms of the Rental Agreement, the Plaintiffs deposited with the Defendant the amount of $1,570.00 as a security deposit." "[P]laintiffs request a judgment against the Defendant awarding actual damages of $1,570."). At trial, Mr. Levine testified to performing drywall repairs on the wall. While appellant contended that he had to redo the drywall work, which he stated was the reason for the $75 fee, he did not dispute that Mr. Levine attempted the drywall repairs. It would be illogical to perform drywall repairs then concede damages for said repairs. Based on the language employed in the complaint and testimony at trial, there is no doubt appellees challenged appellant's withholding of the entire security deposit, including fees associated with the drywall repair and cleaning fees. The purported concession of those damages would, at most, go to credibility at trial.

{¶ 37} As to the evidence regarding the drywall repairs and cleaning fee, the parties, again, present very different accounts as to the state of the home when appellees vacated the property. Ms. Levine testified that they "hired the maids to clean the house top to bottom before we moved out on July 5th, so they -- after we had moved out all of the furniture they came and cleaned the house." (Tr. at 69.) Mr. Levine testified, "[appellant] said the basement needed to be swept and this was literally just several hours after we had it professionally cleaned." (Tr. at 179.) When asked if he agreed the drywall and cleaning charges were reasonable or unreasonable, Mr. Levine responded "unreasonable." (Tr. at 212.)

{¶ 38} Appellant painted a far different picture. Regarding the cleaning fee, appellant testified that "the home had been cleaned; however, there was still a lot of things that had not been cleaned. The garage needed to be cleaned out. The laundry room needed to be cleaned out. The appliances were not pulled out and cleaned out. So all those things had not been taken care of." (Tr. at 312.) Appellant testified that he spent four hours cleaning and charged appellees $100 for his work. (Tr. at 312.) When asked how he arrived at $100, appellant testified, "I figured that most cleaning companies are, I guess, 20, 25 dollars an hour." (Tr. at 392.) When counsel for appellees noted that Addendum B stated

he would charge $20 an hour for labor, appellant responded," It could have been five or six hours. I was there until close to midnight." (Tr. at 392-93.)

{¶ 39} As for the drywall repair, Mr. Levine testified that the movers put a hole in the wall. Prior to vacating the property, he "patched it up, I sanded it down, I did whatever I could." (Tr. at 180-81.) Mr. Levine stated that while he spackled and sanded the area, he was not able to paint it as he could not locate the paint anywhere in the house. (Tr. at 181.) When asked if he was an "expert drywall person," Mr. Levine stated that his "father-in-law's a mason so I've been trained so, yes, I did a good job." (Tr. at 212-13.)[3] Conversely, appellant testified, "Steve had attempted to patch it up with some spackling. It was a pretty rough spackle job, but maybe it's just the tools he had at that time. So I -- I sanded it down and made sure it was flush with the wall and didn't have a bunch of bubbles hanging out." (Tr. at 351.) Appellant stated he charged $75 for three hours of work, which included services for "sanding, prepping, primer, paint, trip to the hardware store." (Tr. at 393.) When asked how he arrived at $75 dollars at an hourly rate of $20, appellant stated, "I mean, it looks like it could have been off by a few bucks, Your Honor." (Tr. at 394.)

{¶ 40} Upon review, we find there was competent credible evidence to support the trial court's determination that appellant was not entitled to damages for the drywall repair and cleaning fee. As the trial court is best positioned to consider the credibility of witnesses and observe their demeanor at trial, there is a presumption that the findings of fact by a judge during a bench trial is correct. *Seasons Coal Co. v. Cleveland*, 10 Ohio St.3d 77, 80 (1984). "The weight to be given the evidence and the credibility of the witnesses are primarily for the trier of fact." *Whitestone* at ¶ 14, citing *State v. DeHass*, 10 Ohio St.2d 230 (1967), paragraph one of the syllabus. Here, the trial court found appellees' testimony more credible. It is well-established law that the credibility of the witnesses are the primary determination of the trier of fact. "[T]he trial judge is best able to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony." *Seasons Coal Co.,* at 80. Based on the foregoing, we find the trial court's determination as to the amount of damages for the drywall repair and cleaning was not against the manifest weight of the evidence.

---

[3] The record is unclear as to appellant's drywall repair qualifications or whether he has any prior masonry training.

### d. Window Screens

{¶ 41} We next turn to the trial court's determination that appellant was not entitled to withhold $50 of appellees' deposit as appellant failed to meet his burden in demonstrating damages to two window screens. The trial court reasoned that appellant failed to establish replacement costs or difference in market value caused by the damage.

{¶ 42} Appellant contends that the trial court erred as he presented the only testimony concerning the window screens at trial.[4] We disagree. While the matter of damages to the window screens were one of the least discussed topics during the trial, Mr. Levine testified as to the letter he received from appellant citing all the allegedly damaged areas to the property. When asked if he "fe[lt] that any of [the charges in the letter, marked as Exhibit K] are legitimate?" Mr. Levine testified "No." (Tr. at 186.) As window screens were included in the letter, it is logical to conclude that appellees contested the legitimacy of the window screen charge. Moreover, on cross-examination Mr. Levine was asked whether he agreed or disagreed that there were repairs needed for the front window screens for $50, he responded, "I don't believe that they needed to be repaired, no." (Tr. at 213.) While appellant testified to replacing the window screens, he provided no receipts for the purchase testifying, "Other than my own time and labor, I don't have any receipts." (Tr. at 407.) Again, the trial court is best positioned to make determinations on credibility of witnesses. Under a manifest weight analysis, we must give every reasonable intendment and presumption in favor of the trial court's judgment and finding of facts. (Further citations omitted.) *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, ¶ 21. We cannot substitute our judgment for that of the trial court. *McGreevy*, at ¶ 8. Given these facts, we find the trial court's decision was based on competent, credible evidence and was against the manifest weight of the evidence.

### e. Landscaping, Washing Machine, and Dishwasher

{¶ 43} In the interests of providing a complete analysis of all of appellant's alleged damages, we also note that appellant has previously alleged damages associated with the landscaping, washing machine, and dishwasher at the property. As set forth in *Levine I*, "[d]uring oral argument, counsel for appellant acknowledged that several damage issues

---

[4] Appellant testified, "The front room screens needed to be -- two front room screens needed to be repaired and, again those were listed in the lease contract at $25 each." (Tr. at 313.)

raised in appellate briefing are no longer contested. Specifically, while the fourth assignment of error asserts the lease agreement required the tenants to maintain the landscaping, counsel acknowledged there was no evidence indicating appellant provided 72-hour notice to appellees as required by the terms of that agreement. Counsel also represented during oral argument that appellant was no longer seeking damages with respect to appliances (i.e., dishwasher and washing machine)." *Levine I* at ¶ 60. We also wrote that "the trial court, in addressing appellant's counterclaim, determined the evidence failed to show appellant provided appellees with 72-hour notice 'to correct any defects regarding the landscaping.' The court also found appellant failed to present any evidence that appellees 'caused an unreasonable amount of damage to both the dishwasher and the washing machine that exceeded normal wear and tear.' " *Levine I* at ¶ 60, fn. 4, quoting September 10, 2018 Decision at 4. Accordingly, as the alleged damages associated with the landscaping, washing machine, and dishwasher were no longer contested, we decline to address these issues.

### 3. Manifest Weight

{¶ 44} In appellant's fourth assignment of error, he argues that the trial court's decision was against the manifest weight of the evidence "since it is based solely upon its legal error by again failing to apply the correct measure of damages." (Appellant's Brief at 32.) Appellant goes on to argue that it is "undisputed" that appellant "proved and established his damages to which he was entitled under both the lease and R.C. 5321.05." (Appellant's Brief at 32.) We disagree. Appellant presents no new issues in this assignment of error reasserting many of his prior arguments. Because we have provided an extensive examination of each award or denial of damages in the previous section, we decline to repeat our analysis in this section.

{¶ 45} Appellant also presents a more general argument that, notwithstanding any of the award at issue, the trial court's general ruling in favor of appellees and against appellant was against the manifest weight of the evidence. After careful review of the entire record, we find the trial court did not clearly lose its way and create such a manifest miscarriage of justice by ruling in favor of appellees and against appellant.

{¶ 46} For the foregoing reasons, appellant's first, second, third, and fourth assignments of error are overruled.

**B. Appellant's Fifth Assignment of Error**

{¶ 47} In appellant's fifth assignment of error, he argues that the trial court erred concluding that he incurred no damages with respect to the carpet. Appellant argues that the trial court's decision that the carpet's reasonable life was approximately eight years was erroneous because appellees' expert, who testified that the reasonable life expectancy of the carpet was seven-nine years, was not credible based on her testimony at trial and lack of experience in single family residential homes.

{¶ 48} The law-of-the-case doctrine is well established in Ohio law. *Giancola v. Azem*, 153 Ohio St.3d 594, 2018-Ohio-1694, ¶ 14. " 'The doctrine of law of the case comes into play only with respect to issues previously determined.' " *Id.* at ¶ 16, quoting *Quern v. Jordan*, 440 U.S. 332, 347 (1979), fn. 18. The doctrine provides that legal questions and issues resolved by a reviewing court in a prior appeal continue as the law of that case for any succeeding proceeding at both the trial and appellate levels. *Giancola* at ¶ 1, citing *Nolan v. Nolan*, 11 Ohio St.3d 1, 3 (1984). The law of the case doctrine " 'is rooted in principles of res judicata and issue preclusion [and] ensures consistent results in a case, avoids endless litigation by settling the issues, and preserves the constitutional structure of superior and inferior courts.' " (Internal quotations and citations omitted.) *State v. Prater*, 10th Dist. No. 20AP-308, 2021-Ohio-3988, ¶ 17, quoting *State v. Norman*, 10th Dist. No. 20AP-427, 2021-Ohio-2389, ¶ 14. The doctrine ensures consistency of results in a case to avoid repetitive, endless litigation on settled issues. (Further citations omitted.) *Giancola* at ¶ 14.

{¶ 49} In *Levine I*, this court rejected a nearly identical[5] assignment of error writing:

> Here, the record indicates Underwood was licensed by the Columbus Board of Realtors, had 30 years of experience in real estate, and had participated in approximately "5,000 plus" move-out procedures involving tenants. (Tr. at 20.) Underwood, who reviewed photographic exhibits and a video of the Brampton Court residence prior to her testimony, stated she has dealt with issues involving unreasonable damage to carpeting "[a] thousand times." (Tr. at 25.) Under Ohio law, in

---

[5] *Compare* appellant's current fifth assignment of error ("The trial court erred by again finding as a matter of law on remand that 'The reasonable life of this carpet was approximately eight years,' because this finding is unsupported by any admissible evidence or Ohio law.") *with Levine I* at ¶ 30 ("The trial court erred by concluding as a matter of law that 'The average life of carpet is 8 years,' because this conclusion is unsupported by any admissible evidence or Ohio law.")

order to "qualify as an expert witness, a potential witness does not have to be the most knowledgeable or the best witness regarding the topic at hand." *In re B.D.T.K.*, 9th Dist. No. 24792, 2009-Ohio-6079, ¶ 25, citing *Scott v. Yates*, 71 Ohio St. 3d 219, 221, 1994-Ohio-462, 643 N.E.2d 105 (1994). In this respect " '[t]he individual offered as an expert need not have complete knowledge of the field in question, as long as the knowledge he or she possesses will aid the trier of fact in performing its fact-finding function.' " *Id.*, quoting *State v. Hartman*, 93 Ohio St.3d 274, 285, 2001-Ohio-1580, 754 N.E.2d 1150 (2001). Upon review, we find no abuse of discretion by the trial court in denying appellant's motion to preclude the testimony at issue.

\* \* \*

Based on the foregoing, appellant's fifth and sixth assignments of error are not well-taken and are overruled.

*Levine I* at ¶ 68, 70.

**{¶ 50}** Following *Levine I*, the trial court was instructed on remand "to determine, upon consideration of a "reasonable wear and tear standard," *Bibler* at ¶ 20, whether the tenants may be subject to liability for extraordinary damages under R.C. 5321.05 and, in the event the evidence supports such a determination, for application of the appropriate measure of damages for temporary injury to property" *Levine I* at ¶ 57. We did not, however, ask the trial court to re-examine its credibility determinations from Underwood's testimony. Accordingly, to the extent appellant asserts the same assignment of error as his previous appeal, the law of the case doctrine precludes the relitigation of this issue previously asserted, and rejected, in *Levine I*.

**{¶ 51}** We note, however, our prior decision in *Levine I* could be read to leave open the question of the reasonable life of the carpet to the extent it informed any potential damages for the carpet. In *Levine I* this court wrote, "Further, to the extent this issue may arise on remand (depending on the trial court's resolution of whether the claimed damage exceeded normal wear and tear), we would simply note that the relevant consideration with respect to useful life would appear to be evidence before the court as to the reasonable life expectancy of the carpet at issue (i.e., evidence as to the useful life of the type of carpeting in appellant's residence)." *Levine I* at ¶ 69. In the interest of clarity, we will consider whether the trial court abused its discretion relying on Underwood's testimony regarding

the reasonable life expectancy of the carpet and applying a pro-rated damages analysis based on depreciation. In *Levine I*, we summarized Underwood's qualifications and testimony as follows:

> At trial, Underwood testified that she is employed by the Wooden Companies and is responsible for "the leases and the management of their boutique collection of properties." (Tr. at 18.) Underwood, who is licensed by the Columbus Board of Realtors, was previously employed for 25 years by Bellows and Associates, a property management company, as well as for five years with DeSantis Property Management.
>
> As noted under the facts, in preparation for her testimony, Underwood reviewed photographs offered as exhibits by appellees depicting the residence at 6764 Brampton Court, as well as a video taken during a walk-through of the residence. At trial, Underwood testified the wear and tear depicted in [p]laintiff's [e]xhibits B, E, and F was not unusual for carpeting of 7 years or greater. She stated, in her experience, tenants are charged for damage on a "pro-rated" basis (i.e., not based on replacement cost). She defined pro-rated as meaning the "life expectancy of the carpet, how many years they lived there." (Tr. at 26.) Underwood also opined that, as a general rule, carpeting is replaced "every seven to nine years." (Tr. at 23.)

*Levine I* at ¶ 64-65.

{¶ 52} In its June 9, 2021 decision, the trial court relied on Underwood's testimony to conclude that the reasonable life of the carpet was eight years, within the seven-nine range espoused by Underwood. The trial court then engaged in a damages analysis, consistent with Underwood's testimony at trial, to find appellant was entitled to $0 as the reasonable life of the carpet had nearly doubled when appellees vacated the property, the carpet was nearly twice as old as its reasonable life expectancy. "[I]n the context of a bench trial, reviewing courts 'afford broad leeway to the trial court in deciding the reliability of particular expert testimony' under Evid.R. 702." *Levine I* at ¶ 67, quoting *Knott v. Revolution Software, Inc.*, 181 Ohio App.3d 519, 2009-Ohio-1191, ¶ 46 (5th Dist.). There is no requirement that an expert possess complete knowledge of the field in question but must possess enough knowledge that he or she will aid the trier of fact in performing its fact-finding function. *State v. Hartman*, 93 Ohio St.3d 274, 285, 2001-Ohio-1580. As Underwood possessed the requisite qualifications to testify as an expert in this case, the

trial court was free to rely on her testimony. As such, to the extent that *Levine I* did not completely resolve this issue, we find the trial court did not abuse its discretion in the relying on Underwood's expert testimony regarding the life expectancy of the carpet and its calculation of damages.

**{¶ 53}** Appellant's fifth assignment of error is overruled.

**C. Appellant's Sixth Assignment of Error**

**{¶ 54}** In appellant's sixth assignment of error, he argues that the trial court erred in awarding attorney fees in this case. The amount of the attorney fees award falls within the trial court's sound discretion. *Timoneri*, at ¶ 51, citing *Bittner v. Tri-County Toyota, Inc.*, 58 Ohio St.3d 143, 146 (1991). A reviewing court will not reverse the trial court's award of attorney fees absent an abuse of discretion and that " ' "the amount of fees determined is so high or so low as to shock the conscience." ' " *Timoneri* at ¶ 51, quoting *Bittner* at 146, quoting *Brooks v. Hurst Buick-Pontiac-Olds-GMC, Inc.*, 23 Ohio App.3d 85, 91 (12th Dist.1985).

**{¶ 55}** When a trial court is making a determination as to the reasonableness of attorney fees under R.C. 5321.16(C), it " 'must first determine the number of hours reasonably expended on the case times a reasonable hourly rate; this provides a useful "objective basis on which to make an initial estimate of the value of a lawyer's services." ' " *Whitestone Co.*, at ¶ 60, quoting *Ridenour v. Dunn,* 10th Dist. No. 03AP-611, 2004-Ohio-3375, ¶ 9, quoting *Bittner,* at 145. The trial court may then modify the amount by applying any relevant factors listed in Prof.Cond.R. 1.5(a). *Timoneri,* at ¶ 52, citing *Bittner* at 145.[6] Prof.Cond.R. 1.5(a) provides the following factors:

> (1) the time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly;
>
> (2) the likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer;
>
> (3) the fee customarily charged in the locality for similar legal services;

---

[6] In *Bittner,* the Supreme Court of Ohio applied the predecessor to Prof.Cond.R. 1.5(a). *Timoneri* at ¶ 52.

(4) the amount involved and results obtained;

(5) the time limitations imposed by the client or by the circumstances;

(6) the nature and length of the professional relationship with the client;

(7) the experience, reputation, and ability of the lawyer performing the services;

(8) whether the fee is fixed or contingent.

Prof.Cond.R. 1.5(a)(1)-(8). While not all factors may apply to every case, the trial court has the discretion to decide which factors are applicable and in what manner it will alter the calculation. *Ridenour* at ¶ 9, citing *Bittner* at 145-46. "A trial court must state the basis for the fee determination. An explanation of the trial court's reasoning is particularly important where the amount recovered is small compared to the attorney fees assessed." (Internal citation omitted.) *Timoneri* at ¶ 55, citing *Schultz*, at ¶ 25; *Whitestone Co.,* at ¶ 61.

**{¶ 56}** Here, appellant first argues that appellees are not entitled to attorney fees because the underlying judgment on the merits of the case was fatally flawed. As discussed in Section A of this decision, we found that the trial court determination regarding the amount of damages was not against the manifest weight of the evidence.

**{¶ 57}** Next, appellant argues that the award of attorney fees itself was improper as the trial court failed to provide the requisite explanation supporting the decision. We agree.

**{¶ 58}** On June 8, 2018, the trial court held a hearing as to the issue of attorney fees. On July 19, 2018, the trial court entered judgment for appellees for $3,140 in damages and $12,957 in attorney fees. The trial court wrote that appellees' counsel testified to expending 59 hours at a rate of $225 per hour as well as his staff expending 5.6 hours at a reduced rate of $40 per hour for a total award of $13,500. The trial court reduced the total award by three hours ($675) as it "will not award fees associated with witness testimony and in defending the counterclaim presented by Defendant." (July 19, 2018 Entry at 2.)

**{¶ 59}** After careful review of the evidence, we cannot find, on its face, the attorney fees award was an abuse of the trial court's discretion. We do, however, find that the award was sufficiently disproportionate to the damages obtained to raise the issue of reasonableness under R.C. 5321.16(C). While the trial court identified the Prof.Cond.R. 1.5

factors, it failed to address which, if any, it applied. Moreover, the trial court failed to provide any reasoning as to the disproportionality between the damages and the attorney fees. We note that the trial court's analysis is not required to be extensive. Our prior decision in *Timoneri* is instructive on this issue. In *Timoneri,* we examined the trial court's award of attorney fees of $10,505 in a landlord-tenant matter that resulted in an award of $695 in damages to the plaintiff. The trial court explained that the award of attorney fees was not lowered in light of the disproportionality between the damages and lodestar amount as:

> This case presents a classic example of why the [L]andlord[-][T]enant [A]ct included a provision for attorney fees. The amount of the initial claim is relatively small, though not insignificant. Through her attorney, Plaintiff demanded return of her wrongfully withheld security deposit and nothing more, although it was noted in that demand letter that failure to timely refund her money would result in litigation, with the risk of double damages and attorney fees. Defendant chose to ignore the letter and force litigation, although the actual facts of the case, as presented in the stipulations[,] have not been in issue for some time.

*Timoneri* at ¶ 56. On appeal, the landlord challenged whether the trial court erred in failing to provide an adequate explanation for the disproportionality between the damages and the attorney fees. This court found that the trial court's explanation regarding the disproportionality between the damages and lodestar amount was sufficient to justify the award of attorney fees. *Id.* at ¶ 57. Here, we conclude that the trial court should have provided a more specific and detailed explanation of the manner in which it arrived at the $12,957 in attorney fees and how that figure was reasonable in light of the disproportionality between the total damages and attorney fees.

{¶ 60} Accordingly, we find appellant's sixth assignment of error well-taken and remand this matter for the trial court to provide further findings as to the $12,957 award regarding the Prof.Cond.R. 1.5 factors and the disproportionality between the damages and lodestar amount. If, upon further consideration of the current record, the trial court decides to modify the amount of the award, the trial court must provide some explanation for doing so. *See Whitestone Co.,* at ¶ 60-62.

## IV. CONCLUSION

{¶ 61} For the foregoing reasons, appellant's first, second, third, fourth, and fifth assignments of error are overruled, and the sixth assignment of error is overruled in part and sustained in part. The judgment of the Franklin County Municipal Court is affirmed in part and reversed in part. This matter is remanded for further proceedings in accordance with the law and consistent with this decision.

*Judgment affirmed in part;*
*reversed in part;*
*and remanded.*

KLATT and DORRIAN, JJ., concur.

_____